# EXHIBIT J

# EXHIBIT J

# INTERNATIONAL DISTRIBUTION AGREEMENT

This Distribution Agreement ("**Agreement**"), is entered into as of April 11, 2017 and is effective as of April 11, 2017 ("**Effective Date**"), by and between **Tammy Taylor Nails, Inc.**, a California corporation ("**TTN**") and Melany Juanita Viljoen and Peet Viljoen, an Australia and Africa Distributor.

## RECITALS

A. TTN manufactures and distributes Tammy Taylor Nails, Inc. products to a worldwide market since TTN's inception of 1983. Products consist of nail enhancement and synergistic product lines bearing the Tammy Taylor logo or Tammy Taylor Nails logo.

B. Distributor desires to exclusively market and distribute the Products in Australia and Africa, Distributor also desires to educate use of the product line as authorized by TTN. TTN desires to grant to Distributor the exclusive right to market and distribute the Products pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, the parties hereto agree as follows:

1. **DEFINITIONS**

As used in this Agreement, the following terms shall have the following meanings:

"**NDA**" means the Nondisclosure Agreement attached hereto as **Schedule A** between the parties.

"**Products**" means those items listed in **Schedule B**, attached hereto, as hereafter amended from time to time.

"**Territory**" means Australia and Africa and its territories.

"**Trade Designations**" means those trademarks, trademark applications, service marks, service mark applications, copyrights, trade names, slogans, labels, logos, titles, trade designations, insignias and other commercial symbols owned by or licensed to TTN presently or in the future, related to TTN's business and products, as further defined in **Schedule C**.

2. **APPOINTMENT OF DISTRIBUTOR**

(a) <u>Appointment</u>. TTN hereby appoints Distributor on the Effective Date, and Distributor hereby accepts appointment, as TTN's sole and exclusive distributor within the Territory for the sale of Products to customers within the Territory, under and subject to the terms and conditions of this Agreement.

31268550.2

(b)  Sales Outside the Territory. Distributor shall not actively advertise, promote or solicit customers for Products outside of the Territory nor establish any office through which orders are solicited or any facility where Products are stored outside of the Territory.

(c)  Limitation of Appointment. This Agreement shall extend only to the Products.

3. **TERM AND RENEWAL**

Unless sooner terminated as provided herein, this Agreement shall continue in effect from the Effective Date for one (1) year ("**Initial Term**"). Upon expiration of the Initial Term, this Agreement shall automatically renew successive for one (1) renewal terms of one (1) year each ("**Renewal Terms**"), unless either Party provides written notice of nonrenewal at least sixty (60) days prior to the end of the then-current term (the Initial Term and any Renewal Term, as applicable, may be referred to herein as "**Term**"), or unless sooner terminated as provided for in Section 11 of this Agreement.

4. **DISTRIBUTOR'S OBLIGATIONS**

(a)  General Requirement. Distributor agrees to use its best efforts to market and promote the sale of Products in the Territory. Distributor agrees not to engage in the sale, distribution, or promotion of competing products obtained from sources other than TTN.

(b)  Essential Term. Distributor understands and agrees with Sections 4(a) and 4(e) herein and Distributor's rights in the Territory shall constitute a material breach on the basis of which TTN shall be entitled to terminate Distributor's rights in the Territory (in addition to any other remedies it may have).

(c)  Marketing and Advertising. Distributor shall instruct customers using the TTN methods of application and usage for the Products via classes provided to interested parties for proper use of Products, in the manner approved by TTN. Distributor shall participate in various area tradeshows in the Territory as agreed upon between TTN and Distributor. Upon reasonable request by Distributor, TTN will provide Distributor with samples of education, marketing and instructions guidelines. Distributor shall develop and be solely responsible for the costs associated with instruction, marketing and advertising the Products and it shall be permitted to produce the form and content of all instruction, marketing and advertising campaigns, including, but not limited to, advertising, sales literature, the publication and promotional materials, subject to TTN's prior written approval.

(d)  Expenses. All costs and expenses incurred by Distributor in connection with the fulfillment of its obligations under this Agreement shall be borne solely by Distributor.

(e)  Records and Inspections. Distributor shall at all times during the Term of this Agreement and for a period of one (1) year thereafter, maintain and furnish to TTN, on

request, complete, accurate and current records sufficient to evaluate Distributor's performance of, and compliance with, its obligations under this Agreement, including but not limited to detailed records on all Products sales and detailed information regarding names and addresses of all customers. Distributor shall report its activities to TTN by submitting monthly sales and depletion reports.

(f) <u>Compliance with Laws and Industry Standards</u>. Distributor shall comply with, and render reasonable assistance to TTN to assist TTN with, its compliance with all governmental laws, ordinances, rules, regulations, and industry guidelines applicable in connection with the sale or shipment of any Product into the Territory, in connection with the fulfillment of any of Distributor's obligations under this Agreement including, but not limited to, the payment of any fees, duties, costs, or taxes assessed on the Products (excluding TTN income taxes), and obtaining any governmental permits, approvals, or certifications or registrations. Distributor shall cooperate fully with TTN in complying with any governmental agency order or rule which may obligate TTN to remedy any problem with any Products located in the Territory, including identification of the specific location of any such Products.

(g) <u>Use of Trade Designations</u>. TTN hereby grants to Distributor, and Distributor hereby accepts from TTN, a non-exclusive, non-transferable, non-assignable, non-licensable privilege to use the Trade Designations, solely in connection with the promotion, advertising and distribution of the Products within the Territory and only during the Term. Distributor shall not dispute TTN's ownership of the Trade Designations, or assist any other party in disputing such ownership. Distributor shall not register or attempt to register the Trade Designations or this Agreement with any governmental authority or otherwise.

(h) <u>Markings</u>. Distributor shall not remove or alter any notices, labels, tags or other identifying markings, symbols or legends, whether incorporating the Trade Designations or otherwise, affixed to the Products, containers or packages except as required by laws and regulations of the Territory.

(i) <u>No Use Outside the Territory</u>. Distributor shall refrain from using any of the Trade Designations as part of any corporate, trade or firm name or style of Distributor or in connection with the advertisement, promotion, sale or solicitation for sale of any Product from or to any place of business or facility located outside of the Territory.

(j) <u>No Claims to Trade Designations</u>. Subject to the limited intellectual property license set forth in <u>Section 4(k)</u> herein, Distributor acknowledges and agrees that it does not have, nor shall it ever have or claim, any right, title or interest in any of the Trade Designations, and that during the Term and thereafter, TTN shall own all right, title and interest in and to the Trade Designations. In addition, Distributor agrees not to file or otherwise seek any intellectual property rights of any kind, whether within or outside of

the Territory, related to or arising under this Agreement, as it may be amended from time to time, without the express written permission of TTN.

(k)  Infringement. Distributor shall promptly notify TTN in writing of any suspected or actual infringement or other suspected or actual unauthorized use of the Trade Designations which may come to the attention of Distributor, as well as any claim of infringement of any Trade Designations rights against Distributor. Thereupon, TTN shall, in its sole discretion, determine whether or not it wishes to undertake any action to defend Distributor or against a third party on account of said person's alleged infringement of the Trade Designations. In the event TTN undertakes such action, it shall have the authority and power of attorney to prosecute or settle such action. Distributor agrees to render such assistance as TTN requires and agrees to cooperate fully with TTN. Distributor shall have no right to prosecute any claim of any kind or nature whatsoever against any alleged infringer for or on account of any alleged infringement.

(l)  Insurance. Distributor shall maintain in force, during the Term one or more policies of liability insurance with an insurer acceptable to TTN which shall cover all liabilities of TTN and Distributor, whenever arising, attributable to Products sold under this Agreement and in an amount determined by TTN. TTN reserves the right to specify additional types of insurance coverage and to change the limits required.

(m)  Designated Lists. Distributor certifies that, to the best of Distributor's knowledge, neither Distributor or any owners, officers, directors, shareholders, partners, associates, or affiliates of Distributor are listed on the U.S. Department of Treasury Office of Foreign Assets Control Specially Designated National's List, available at site http://www.treas.gov/offices/enforcement/ofac/sdn; nor have they been designated a terrorist and/or a suspected terrorist; nor is Distributor or any such persons and/or affiliates/associates owned, controlled, associated, and/or affiliated in any way with any terrorist and/or a suspect terrorist person and/or organization, as defined in U.S. Executive Order 13224 and/or otherwise.

(n)  Corrupt Practices. Distributor agrees and warrants that, in the performance of its obligations under this Agreement, it shall not take any action which will render Distributor liable for a violation of the U.S. Foreign Corrupt Practices Act, which prohibits illegal offering, giving, or promising to offer or give, directly or indirectly, money or anything of value to any official of a government, political party, or illegal instrumentality thereof in order to assist Distributor or Distributor in acquiring or retaining business.

5.  **TTN'S OBLIGATIONS**

(a)  Product Quantities. TTN shall use commercially reasonable efforts to supply Distributor with sufficient quantities of Products to meet Distributor's needs in the Territory.

4

(b) **Merchantability of Products.** The Products that TTN supplies to Distributor shall be merchantable and fit for their intended purpose. TTN makes no other warranties, expressed or implied, and shall not be responsible for damage to the Products after their delivery to Distributor, as determined pursuant to Section 6(c) of this Agreement.

(c) **Product Replacement.** TTN shall replace within one-hundred and twenty (120) days after receiving written notice from Distributor any Products that are not merchantable if the reason for their condition arose from the manufacture or packaging of the Products or the mishandling of the Products prior to their delivery to Distributor's Port, as defined in Section 6(d).

(d) **Conformity with Legal Requirements.** TTN shall satisfy all legal and regulatory requirements, and obtain all necessary licenses that may be required under the laws of the United States, and shall notify the Distributor of the existence and content of any provisions of law in the jurisdiction of TTN that conflicts with any provision of this Agreement at the time of its execution or thereafter.

(e) **Enforcement of Infringing Distributors.** In the event that any distributors of TTN that are licensed to sell Products outside of the Territory, directly or indirectly, or otherwise facilitate the sale of Products in the Territory, TTN shall use its best commercial efforts to enforce its contractual rights and remedies against its distributors to cease further exporting of Products into the Territory and otherwise use its best commercial efforts to seek legal remedies arising from any exporting of the Products into the Territory, contrary to this Agreement.

6. **PRICE AND PRODUCT ORDERS**

(a) **Product Prices.** The prices Distributor shall pay to TTN for the Products shall be as shown in **Schedule B**, attached hereto, as amended from time to time on seven (7) days written notice from TTN to Distributor at TTN's sole discretion.

(b) **Purchase Orders.** Each sale and purchase of the Products hereunder shall be evidenced by a separate individual purchase order, which shall become effective and binding upon the parties at the time when an order placed by Distributor is acknowledged or accepted by TTN by issuing to Distributor a written order acknowledgement, a form of which shall be determined by both parties herein ("**Order Acknowledgement**"). Distributor's written purchase orders ("**Purchase Orders**") shall specify in reasonable detail the types, quantities, and delivery dates of the Products ordered. Upon receipt of the Purchase Order, TTN shall inform Distributor by electronic mail or facsimile whether it can fulfill such Purchase Order. If TTN is unable to fulfill the Purchase Order despite using its reasonable commercial efforts to do so, both parties herein shall discuss and endeavor in good faith to negotiate the terms of such Purchase Order on mutually satisfactory terms. TTN shall issue an Order Acknowledgement or written notice of its intention of rejection to Distributor within five (5) business days after TTN first receives

Purchase Order from Distributor. Notwithstanding any provision herein to the contrary, any terms in any Purchase Order, Order Acknowledgement, ordering document, or other communication from either party that are different or inconsistent with the terms of this Agreement shall be deemed rejected unless such terms have been specifically accepted in writing by an authorized representative of TTN.

(c)     Delivery and Shipping; Title and Risk of Loss. Unless otherwise specified, the deposit in accordance with purchase orders will be per EXW (Distributor's Facility) Incoterms 2010©.   Without prejudice to Section 6(b) herein, TTN shall use its commercially reasonable efforts to ship the ordered Products on the date set forth in the Purchase Order accepted and acknowledged by TTN in accordance with Section 6(b) herein (unless Distributor has agreed to a different shipping date).

(d)     Acceptance. Distributor shall inspect all Products promptly upon receipt thereof. Products not rejected by written notice to TTN within ten (10) business days of receipt by Distributor at Distributor's site shall be deemed to have been accepted.   Rejected Products shall be returned to TTN and TTN shall prepay or reimburse Distributor for any shipping charges incurred by Distributor connection with the return to TTN of properly returned goods.   As promptly as possible, TTN shall, at its option and expense, either replace such rejected Products or reimburse Distributor for the cost of the Products.

(e)     Payment. Upon receipt of the Order Acknowledgement, Distributor shall make direct payment to TTN prior to shipment via pre-approved credit card or wire transfer.

(f)     Taxes. Distributor shall bear all taxes and all customs, export and import duties, fees and similar charges with respect to the Products purchased by the Distributor and shipped to the Distributor.

7.     **INDEMNIFICATION**

Distributor shall, during the Term and after the termination or expiration of this Agreement, protect, defend, indemnify and hold TTN, and its affiliates and associates, officers, directors, managers, shareholders, members, employees, agents, representatives and assignees harmless against any and all liability for all claims of every kind or nature arising in any way out of or relating to Distributor's actions or failure to act, whether personal or in connection with the sale of the Products in the Territory, any other actions or failure to act by Distributor, its agents or representatives or any breach of this Agreement. For purposes of this indemnification, "**claims**" means and includes all obligations, actual and consequential damages, losses, claims, demands, liens, reckonings, accounts and costs incurred in the defense of any claim (such as, by way of illustration, but not limitation, accountants', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses). TTN shall have the right to defend any such claim against it with counsel of its own choosing. Distributor shall have no right to settle or refuse to settle any claim; TTN shall retain

22268550.2

all right to do so. In addition, Distributor agrees to cooperate fully with TTN in any other claims brought by or against TTN.

8. **PRODUCT WARRANTY**

(a) TTN MAKES NO WARRANTY WHATSOEVER WITH RESPECT TO THE PRODUCTS, INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; OR (C) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER EXPRESS OR IMPLIED BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE.

9. **CONFIDENTIALITY**

(a) Confidentiality. The NDA applies to this Agreement as if fully set forth herein, and all of the terms of this Agreement and all discussions and negotiations related to this Agreement and all trade secrets and other confidential information of TTN are considered Confidential Material (as that term is defined in the NDA) of the parties under the NDA.

10. **TERMINATION**

This Agreement may be terminated in accordance with the following provisions:

(a) Termination by Either Party. Either party may terminate the Agreement:

(i) at any time by giving notice in writing to the other party, which notice shall be effective upon dispatch, should the other party file a petition of any type as to its bankruptcy, be declared bankrupt, become insolvent, make an assignment for the benefit of creditors, go into liquidation or receivership, or otherwise lose legal control of its business;

(ii) by giving notice in writing to the other party, which notice shall be effective upon dispatch, should an event of force majeure described in Section 15(b) continue for more than one hundred and eighty (180) consecutive days.

(b) Termination by Distributor. Distributor may terminate this Agreement at any time by providing TTN with ninety (90) days' written notice. The 90-day notice period is intended to allow TTN to make alternative distribution arrangements, and TTN may elect to terminate this Agreement in less than ninety (90) days after receipt of Distributor's notice of termination.

(c) Termination by TTN; Notice; Right to Cure. TTN may terminate this Agreement immediately upon written notice to Distributor if:

(i) Distributor is in material breach of this Agreement, which breach is not cured within thirty (30) days from receipt of written notice from TTN of such breach; or

(ii) Distributor shall have failed to meet the Guaranteed Minimum Sales and has not cured such breaches within thirty (30) days from the date of receipt of written notice from TTN of such breach.

(d) <u>Termination by TTN Upon Distributor Receipt of Notice</u>. TTN may terminate this Agreement immediately upon written notice to Distributor if:

(i) Distributor engages in fraudulent conduct with respect to TTN or the Products; or

(ii) Distributor knowingly sells the Products to persons outside the Territory.

(e) <u>Post Termination</u>. Upon termination, Distributor shall provide to TTN its then current list of prospects and customers, including company name, contact, address and telephone number, facsimile number, and email if applicable.

## 11. TERMINATION CONSEQUENCES

The following shall govern the rights, duties and obligations of the parties upon expiration or termination of this Agreement, however occurring:

(a) <u>Obligations of Parties</u>. Termination shall not release or affect, and this Agreement shall remain fully operative as to, any obligations of or liabilities incurred by the parties prior to the effective date of such termination; and all indebtedness of one party owing to another party shall become immediately due and payable on the effective date of termination.

(b) <u>Cease as Distributor</u>. Upon expiration or termination of this Agreement Distributor shall cease and desist immediately and permanently all use of, and shall not thereafter use in any manner, any Trade Designations, as well as any name, trademark, trade name, slogan, title, label, insignia, commercial symbol or anything else which would be likely to lead to confusion or uncertainty as to whether, or make it appear that, Distributor is an authorized distributor of any Products.

(c) <u>Return of Property</u>. Immediately after expiration or termination, Distributor shall return any property of TTN then in Distributor's possession including all books, catalogs, reference books, bulletins, mailing lists, pamphlets, kits, signs, photography and other materials of any kind previously supplied to Distributor by TTN, including all copies and reproductions.

(d)     Confidential Material. Except as authorized by a party in writing, each party shall return or destroy all Confidential Material, including all electronic copies thereof and, if requested by a party, the other party shall certify that it has done so.

(e)     Purchase Orders. Any Purchase Orders received by TTN from Distributor, whether or not accepted by TTN, which have not been shipped prior to Distributor's receipt of the notice of termination or the effective date of termination or expiration, whichever shall occur first, may be cancelled by TTN, in its sole discretion. Distributor may submit orders for Products to TTN at any time prior to the effective date of termination or expiration, which orders may be accepted or rejected, in whole or in part, by TTN, in its sole discretion. Neither Distributor nor TTN shall have any claim against the other for compensation in connection with any Purchase Order which is not filled as a result of the provisions of this Section 11(e).

(f)     Destruction of Remaining Products. If Distributor has any unsold Products in its inventory, Distributor shall provide TTN with a full statement of the kinds and numbers of Products. Following termination, Distributor shall be required to destroy all remaining Products, and to provide satisfactory evidence of the destroyed Products to TTN.

(g)     Advertising Materials. Except as authorized by TTN in writing, Distributor shall return to TTN or destroy, all copies of advertising, promotional and display materials containing any references to the Trade Designations, and shall provide satisfactory evidence of such destruction to TTN.

12. **ASSIGNMENT**

The rights and duties of Distributor under this Agreement are personal and may not be assigned, sold, transferred or otherwise given to any other party, in whole or in part, directly or indirectly, including without limitation through the transfer of all or part of the ownership of Distributor. TTN shall be free to assign, sell or transfer this Agreement to any party to which it transfers the Trade Designations and the right to manufacture the Products.

13. **LIMITATIONS OF REMEDIES**

(a)     DELAY. TTN SHALL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES CAUSED BY DELAYS THAT WERE BEYOND ITS REASONABLE CONTROL IN FULFILLING ORDERS ACCEPTED FROM DISTRIBUTOR OR IN MEETING DELIVERY DATES.

(b)     CONSEQUENTIAL DAMAGES. IN NO EVENT SHALL TTN BE LIABLE FOR ANY (i) INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES; (ii) SPECIAL DAMAGES; (iii) EXEMPLARY DAMAGES; (iv) DAMAGES FOR LOSS OF PROFIT; (v) DAMAGES FOR LOSS OF REVENUE; OR (vi) DAMAGES FOR

LOSS OF USE ARISING IN ANY WAY IN CONNECTION WITH THIS AGREEMENT.

## 14. VENUE AND CHOICE OF LAW

(a) Each party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against any other party in any way arising from or relating to this Agreement and all contemplated transactions, including, but not limited to, contract, equity, tort, fraud and statutory claims, in any forum other than the United States District Court for the Southern District of California or, if such court does not have subject matter jurisdiction, the courts of the State of California sitting in Orange County, and any appellate court from any thereof. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in the United States Southern District Court for the State of California or, if such court does not have subject matter jurisdiction, the courts of the State of California sitting in Orange County. Each party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b) This Agreement is governed by, and shall be construed and enforced in accordance with, the laws of the State of California, without giving effect to any conflict of laws rules, and each party irrevocably submits to the exclusive jurisdiction of the federal and state courts located in the State of California for the purposes of any action or proceeding arising out of or relating to this Agreement. Each Party hereby waives any objection based on *forum non conveniens* and waives any objection to venue of any action instituted hereunder. If any legal action or any arbitration or other proceeding is brought in connection with this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees, accounting fees, and other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled. FOR PURPOSES OF ANY SUCH COURT PROCEEDINGS, EACH PARTY AGREES, AFTER CONSULTATION WITH ITS COUNSEL, THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE, AND NOT A JURY, AND EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BEFORE A JURY.

(c) THE UNITED NATIONS CONVENTION ON THE INTERNATIONAL SALE OF GOODS IS EXPRESSLY EXCLUDED AND SHALL NOT APPLY TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

## 15. MISCELLANEOUS

(a) Status of Distributor. Distributor shall act as an independent contractor under this Agreement and shall have no power, right or authority, expressed or implied, to create or assume in any manner any obligation of any kind on behalf of TTN or in TTN's name. Neither party is in any respect an agent, employee or legal representative of the other and

232485302

10

neither party shall hold itself out as such for any purpose whatsoever. Distributor shall not sign TTN's name or the name of any director, officer, employee or other agent of TTN to any instrument or other document.

(b)     Force Majeure.   Except for the payment of money, both parties hereto shall be released from their respective obligations under this Agreement in the event of national emergency, terrorism, war or material and prohibitive governmental regulations or any other cause beyond the reasonable control of the parties rendering the performance of this Agreement impossible, whereupon all moneys due under this Agreement shall be paid immediately.

(c)     Notice.   Any notice required or permitted to be given by either party or in connection with this Agreement shall be in writing and shall be deemed duly given: (i) if personally delivered; (ii) if sent by reputable overnight international courier; or (iii) if sent via facsimile or email transmission; to the applicable party at the address or fax number indicated below:

If to Distributor:   [Insert Distributor contact information
[Fax:                ]
                     [Email: melv@tammytaylornails.co.za /Melv@
                     glauisbo(thails.co.za /info@tammytaylornails.co.za

If to TTN:           Tammy Taylor Nails, Inc.
                     2001 E. Deere Ave.
                     Santa Ana, California 92705
                     Fax: 949-250-1853
                     Email:Tammytaylorttn@yahoo.com

All notices will be deemed given when sent if sent by facsimile or e-mail or personal delivery, and two (2) business days after being sent by overnight international courier. No objection may be made to the manner of delivery of any notice actually received in writing by an authorized agent of a party.

(d)     Currency of Payment.   Notwithstanding anything to the contrary in this Agreement, all payments made by the parties to each other shall be made in the currency of the United States of America.

(e)     Entire Agreement.   This Agreement, including all Schedules attached hereto, constitutes the entire agreement between the parties concerning the subject matter hereof, and supersedes and cancels all prior agreements, understandings and discussions between the parties, whether written, oral or implied, including without limitation any prior agreement (whether written or oral or by course of dealing). No modification, amendment, rescission or waiver of this Agreement, or any provision hereof, shall be binding on any party unless evidenced by an instrument in writing duly signed by an

11

232468370.2

authorized representative of the party to be bound. Any Purchase Orders from Distributor shall only have effect as to quantity ordered and any terms and conditions thereon shall have no force or effect.

(f) <u>No Waiver</u>. The failure or delay of either party to insist in any one or more instances upon performance of any of the provisions of this Agreement or to take advantage of any of its rights hereunder shall not be construed as a waiver of any such provisions or the relinquishment of any such rights, and the same shall continue and remain in full force and effect. No single or partial exercise by either party of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

(g) <u>Severability</u>. In the event any word, phrase, clause, sentence or other provision of this Agreement shall violate any applicable statute or rule of law in any particular circumstance or governing jurisdiction, such provision shall be ineffective to the extent of such violation, without in any way invalidating or affecting the enforceability of such provision in any other jurisdiction or circumstance or of any other provision of this Agreement.

(h) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and each such counterpart shall be deemed to be an original.

(i) <u>Language</u>. Distributor represents and warrants that he or she is fluent in the English language and understands the terms of this Agreement. All materials and information provided to Distributor by TTN pursuant to this Agreement shall be provided in the English language. If Distributor desires to translate these materials into a local language, Distributor shall bear the cost of such translation (which may include re-translation into English to check on the accuracy of the translation). After the materials have been translated from English into such language, Distributor shall submit the revised materials to TTN for TTN's consent prior to use by Distributor. All original and translated materials shall belong exclusively to TTM. All meetings between representatives of TTN and Distributor shall be conducted in English. Distributor shall bear the cost of any interpreters, if necessary.

[Signatures on following page]

IN WITNESS WHEREOF, the parties hereto intending to be legally bound, have executed this Agreement as of the Effective Date.

Tammy Taylor Nails, Inc.

By: *[signature]* Tammy Taylor
Name: Tammy Taylor
Title: President/CEO

Distributor: Melany & Peet Viljoen

By: TAMMY TAYLOR SA
Name: _____

## Schedule A

## NONDISCLOSURE AGREEMENT

April 11th, 2017

Dear Ladies and Gentlemen:

In connection with your consideration of a possible transaction or business relationship with **Tammy Taylor Nails, Inc.** ("Company") you have requested information concerning the Company. As a condition to you or your directors, officers, employees, agents, representatives or associates ("Representatives") being furnished such information, you agree to treat such information (whether prepared by the Company, its advisors or otherwise) which is furnished to you by or on behalf of the Company prior to, on or after the date of this letter (herein collectively referred to as "Confidential Material"), together with analyses, compilations, studies and other documents or records prepared by you, your Representatives, or others which contain or reflect or are generated from the Confidential Material, confidentially in accordance with the provisions of this letter. The term "Confidential Material" does not include information which (i) is already in your possession prior to the delivery thereof by the Company, provided that such information is not known by you to be subject to another confidentiality agreement with or other obligation of secrecy to the Company, or (ii) becomes generally available to the public other than as a result of a disclosure by you.

You recognize and acknowledge the competitive value and confidential nature of the Confidential Material and the damage that could result to the Company if information contained therein is disclosed to any third party. You hereby agree that the Confidential Material will be used by you solely for the purpose of the business relationship between the Company and you, and that such information will be kept confidential by you and your Representatives and will not be used for any other purpose, and will not be published or disclosed by you to any other party; provided, however, that (i) any of such information may be disclosed to your Representatives who need to know such information for the purpose of evaluating any such business relationship between the Company and you (providing such Representatives shall be informed by you that such information is Confidential Material and shall be directed by you to treat such information confidentially), and (ii) any disclosure of such information may be made to which the Company consents in writing. You further agree that you shall be responsible for any breach of this agreement by any of your Representatives.

Although the Company has endeavored to include in the Confidential Material information known to it which it believes to be accurate and relevant for the purpose of your investigation, you understand that neither the Company nor any of its affiliates, representatives or advisors have made or make any representation or warranty as to the accuracy or completeness of the Confidential Material. You agree that the Company nor its affiliates, representatives or advisors shall have any liability to you or any of your Representatives resulting from the use of the Confidential Material.

In the event that you do not proceed with the transaction or business relationship which is the subject of this letter within a reasonable time or the business relationship between you expires or is terminated, you shall promptly redeliver to the Company all written Confidential Material and any other written material containing or reflecting any information in the Confidential Material (whether prepared by the Company, its advisors or otherwise) and will not retain any copies, extracts or other reproductions in whole or in part of such written material. All documents, memoranda, notes and other writings whatsoever prepared by you or your Representatives based on the information in the Confidential Material shall be destroyed, and such destruction shall be certified in writing to the Company by an authorized officer supervising such destruction.

In the event that you do not proceed with the transaction or business relationship which is the

22268550.2

14

subject of this letter within a reasonable time or the business relationship between you expires or is terminated, neither you nor your Representatives shall, without the prior written consent of the Company, use any of the Confidential Material for any purpose.

You agree that this agreement does not authorize you to use any of the trademarks, copyrights, patents or other intellectual property of the Company for any purpose other than the discussion of this proposed transaction, until such time as we enter into an agreement authorizing such licensed use. You are not authorized to apply for any trademark to be used with the proposed business that may result from our discussions and proposed transaction without our written permission.

You agree that, unless and until a definitive agreement between the Company and you with respect to any transaction or business relationship referred to in the first paragraph of this letter has been executed and delivered, neither the Company nor any of the Company's affiliates or you will be under any legal obligation of any kind whatsoever with respect to such a transaction or business relationship by virtue of this or any written or oral expression with respect to such a transaction or business relationship by any of you or your Representatives or the Company or its directors, officers, partners, employees, agents, representatives or advisors except, in the case of this letter, for the matters specifically agreed to herein.

No failure or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

You acknowledge and agree that money damages would not be a sufficient remedy for any breach of this Agreement by you or your Representatives and that the Company shall be entitled to specific performance and injunctive or other equitable relief as remedies for any such breach. Such remedies shall not be deemed to be the exclusive remedies but shall be addition to all other remedies available at law or in equity to the Company. You waive, and agree to use your best efforts to cause your Representatives to waive, any requirement for the securing or posting of any bond in connection with any such remedy.

This letter shall be governed by, and construed in accordance with, the applicable laws as set forth under Section 11.5 of that certain International Distribution Agreement between the Company and you. You agree and consent hereby to personal jurisdiction in any court in Orange County, California, USA having subject matter jurisdiction in connection with any matter arising hereunder.

Please execute and return the enclosed copy hereof to evidence your agreement herewith.

**Tammy Taylor Nails, Inc.**

By: Tammy Taylor
Title: President/CEO   *[signature: Tammy Taylor]*

Agreed and Accepted to this eleventh day of April, 2017.

Name: Melany Viljoen
Title:

Signature: *[signature]*

Name: Tact Viljoen
Title:

Signature: *[signature]*

23246550.2

16

## Schedule B

## Products

17

# Schedule C

## Trade Designations

Schedule D

22769494.2

Schedule D