# EXHIBIT K

# EXHIBIT K

# MASTER LICENSE AGREEMENT

THIS AGREEMENT is entered into as of ilpflov '1ϒ, 2018 (the "**Effective Date**"), by and between Tammy Taylor Nails, Inc., a California corporation (the "**Licensor**"), and Melany Juanita Vijoen and Peet Viljoen, individuals (collectively, the "**Licensee**").

## WITNESSETH:

WHEREAS, Licensor manufactures and distributes products consisting of nail enhancement and synergistic product lines bearing certain logos and marks under the Tammy Taylor or Tammy Taylor Nails name (the "**Products**");

WHEREAS, Licensee currently serves as a distributor of the Products pursuant to an International Distribution Agreement dated as of April 11, 2017 (the "**Distribution Agreement**");

WHEREAS, Licensee, on behalf of Licensor, has established a line of salons operated by unaffiliated third parties (the "**Sublicensees**") in Africa ("the **Territory**") under the Marks and utilizing the Proprietary Information and the System (the "**Salons**");

WHEREAS, Licensor is the owner of the Intellectual Property (as defined below) used in connection with the manufacture and distribution of the Products and the operation of Salons;

WHEREAS, the parties wish to confirm their respective rights and obligations in connection with the sublicensing of Sublicensees to operate Salons in the Territory, subject to the terms and conditions set out in this Agreement.

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the sufficiency of which is acknowledged, and incorporating the above recitals, the parties, each intending to be legally bound hereby, do promise and agree as follows:

1. **DEFINITIONS**

    **1.1** "**Intellectual Property**" means the Marks, Proprietary Information, and the System.

    **1.2** "**Marks**" means TAMMY TAYLOR® and TAMMY TAYLOR NAILS® and all other and related trademarks, trade names, service marks, designs, emblems, logos, slogans, copyrights, trade dress, trade secrets, commercial symbols and other indicia, now or hereafter used or intended to be used or hereafter used in connection with the Products and the System as designated by Licensor in writing, and any and all revisions, modifications and additions thereto, whether or not recorded or registered with any local, state, federal or foreign agency, registrar or body.

    **1.3** "**Proprietary Information**" means proprietary practices and procedures developed and utilized in the establishment, development, operation and management of Salons.

    **1.4** "**System**" means a system using the Marks and Proprietary Information for the establishment, development, operation and management of Salons, including without

38766626:2



limitation standards and specifications for products and services to be offered, lists of approved and designated suppliers, trade dress, and other items involved in the operation of Salons.

2. **LICENSE GRANT**

    2.1    **Grant of Rights.**  Licensor hereby grants to Licensee a non-transferable license in the Territory in accordance with the terms and conditions of this Agreement to use the Intellectual Property in the Territory in connection with offering and selling to Sublicensees the right to establish Salons in accordance with the System. Licensee agrees not to use the Intellectual Property except as specifically set forth herein.

    2.2    **Acknowledgement of Ownership.**

        2.2.1 Licensee has been involved in creating and implementing the Proprietary Information and the System and will continue to develop methods of operation that may become part of the System. Nevertheless, Licensee acknowledges that (a) Licensor is the owner of the Intellectual Property and all goodwill related thereto, and (b) all use of the Intellectual Property under this Agreement and any goodwill accruing from such use will inure solely to the benefit of Licensor.

        2.2.2 Contemporaneously with the execution of this Agreement, Licensee shall cause Justsmart Mobile (Proprietary) Limited to assign to Licensor the South Africa trademark applications for registration of the TAMMY TAYLOR SOUTH AFRICA logo, such assignment to be effectuated by execution of assignment in the form attached hereto as "**Exhibit A**" that is by this reference incorporated into and made a part hereof, and such other instruments of assignment that are reasonably necessary to effectuate the assignment of the South Africa trademark applications for registration identified therein to Licensor. Licensor shall have the right to record such instrument of assignment with the South Africa Trademark Office and with any other agency, office or authority in any and all other jurisdictions and countries of the world.

        2.2.3 If Licensee acquires any rights in the Intellectual Property, by operation of law or otherwise, Licensee hereby irrevocably assigns such rights to Licensor without further action by any of the parties. Licensee agrees not to dispute or challenge, or assist any person in disputing or challenging, Licensor's rights in and to the Intellectual Property or the validity of the Marks.

    2.3    **Licensee Restrictions.**  Licensee agrees that it shall not, during the Term or thereafter, directly or indirectly:

        2.3.1 take, omit to take, or permit any action which will or may dilute the Marks or tarnish or bring into disrepute the reputation of or goodwill associated with the Marks or Licensor, or which will or may invalidate or jeopardize any registration of the Marks;

        2.3.2 do or cause to be done any act or thing directly or indirectly contesting the validity of or in any way impairing or tending to impair any part, of Licensor's right, title, and interest in the Intellectual Property;



3876662v2

2

        2.3.3 apply for, or obtain, or assist any person in applying for or obtaining any registration of the Marks, or any trademark, service mark, trade name, or other indicia confusingly similar to the Marks in any country; or

        2.3.4 in any manner represent that it has any ownership in the Intellectual Property, and Licensee acknowledges that its use of the Intellectual Property shall not create in Licensee's favor any right, title or interest in or to the Intellectual Property.

    **2.4** **No Encumbrances.** Licensee shall not grant or attempt to grant a security interest in, or otherwise encumber, the Marks or record any such security interest or encumbrance against any application or registration regarding the mark in the United States Patent and Trademark Office or elsewhere.

    **2.5** **Reservation of Rights.** Licensor hereby reserves all rights not expressly granted to Licensee under this Agreement.

    **2.6** **Term.** Except as otherwise provided herein, and subject to earlier termination in accordance with its terms, this Agreement expires twenty (20) years after the Effective Date.

## 3. LICENSE FEE

    **3.1** **License Fee.** Licensee shall pay to Licensor a continuing license fee in an amount equal to one percent (1%) of Gross Sales (the "**License Fee**"). "**Gross Sales**" means the entire gross receipts of every kind and nature on account of all products sold in and from all of the Salons in the Territory, including without limitation the Products, and all services performed by each Sublicensee in and from all of the Salons in the Territory, without reserve or deduction for inability or failure to collect, and excluding only the amount of any harmonized goods and services and other sales tax levied upon retail sales which are payable to the appropriate governmental authorities (and subsequently actually paid to such authorities). Licensee shall pay the License Fee to Licensor within forty-eight (48) hours of receipt from Sublicensees. Licensee shall submit to Licensor with each License Fee payment a statement of Gross Sales and payments by each Sublicensee and other data in a form acceptable to Licensor. The License Fee is fully earned immediately upon payment to Licensor and is nonrefundable.

    **3.2** **Late Fee.** In addition to all other rights and remedies that Licensor may have, Licensee shall pay Licensor a late fee with respect to all late or overdue payments, calculated at the rate of two percent (2%) per month (twenty-four percent (24%) per annum), not to exceed the highest applicable rate allowed by law, payable when the fee or report is overdue. This provision does not constitute agreement by Licensor to accept such payments after they are due or a commitment to extend credit to, or otherwise finance such amounts.

    **3.3** **No Withholding of Payment.** Licensee will not, on the grounds of the alleged nonperformance by Licensor of any of its obligations hereunder or for any other reason whatsoever, withhold payment of any amounts due, nor shall Licensee have any right of offset.

    **3.4** **Application of Payments; Right of Offset; Nonrefundable.** Notwithstanding any designation by Licensee, Licensor may apply any payments by Licensee to

3

38766626\2



any past due indebtedness of Licensee. In addition, Licensor shall have the right to offset any amounts due to it or its affiliates against any amounts to be paid to Licensee. All payments by Licensee to Licensor are nonrefundable.

3.5 **Taxes.** Any and all amounts expressed as being payable pursuant to this Agreement are exclusive of any applicable taxes. In the event Licensee is required by local law to withhold or deduct any tax on behalf of Licensor from any amount payable to Licensor under this Agreement, License shall withhold and remit such amount and shall provide Licensor with (i) documentation showing that Licensor is being taxed at the lowest rate allowed under local law or under a treaty with the United States, and (ii) written receipts from the appropriate taxing authority certifying that payments have been made on Licensor's behalf at the rates previously communicated to Licensor. Licensee shall cooperate with Licensor in permitting Licensor to obtain foreign tax credits for all amounts withheld or remitted. If Licensor or its owner is not eligible for a tax refund or credit for such amount, Licensee shall increase the amount of the applicable fee to equal the deducted or withheld amounts.

3.6 **Payments in United States Dollars.** All amounts payable to Licensor under this Agreement shall be payable in United States Dollars (unless otherwise specifically provided herein or unless Licensor elects, in its discretion, to accept payment in other currency, calculated using the selling rate of exchange for United States Dollars (as reported by any bank or financial institution designated by Licensor) (the "**Applicable Rate**") on the last day of the month to which the payment relates (unless such date is not a business day in which case the applicable date shall be the next business day) or on the due date for payment of such amounts, as applicable. All costs of currency exchange shall be borne by Licensee.

3.7 **Audits.** Licensor or its representative will have the right during normal working hours to audit the books and records of Licensee, including Licensee's computer records and tax returns, with respect to the Salons and compliance with this Agreement. Licensee agrees to keep and maintain for a period of at least four (4) years (even if this Agreement expires or is terminated) true, original, and accurate records of the Salons, including, without limitation, accounts, books, licenses, data and contracts. Furthermore, Licensee agrees to keep its books and records open to examination, copying and audit by Licensor including, without limitation, its files relating to its Sublicensees. Upon Licensor's request, Licensee shall prepare and produce all of Licensee's business and personal records, bank statements, financial statements, tax returns, financial statistics and any other relevant document or data for Licensor or its representative to verify that all fees due to it are paid by Licensee. Any such information provided to Licensor pursuant to this Section shall belong to Licensor and may be used and published by Licensor in connection with the System. Upon Licensor's request, Licensee shall furnish Licensor with complete copies of any federal or state income tax returns covering the Salons which Licensee shall certify as true and correct.

4. **COMPLIANCE WITH LAWS**

4.1 **Franchise and Other Laws.** Licensee shall conduct its business pursuant to this Agreement in accordance with all applicable laws. In particular, and not in limitation of the foregoing, Licensee acknowledges that the laws of the Territory may require that a franchise disclosure document containing information about both Licensor and Licensee be delivered to

4

38766626.2

prospective Sublicensees the requisite amount of time before any agreement is signed by the parties or consideration is delivered. Licensee agrees to comply in all respects with all franchising and other applicable laws of the Territory.

    **4.2**    **Representations.** Licensee shall not make any representations to any prospects about Licensor, or otherwise, which are misleading, incomplete, fraudulent or untrue, or which are contradicted by any disclosure document. In particular, and not in limitation of the foregoing, Licensee will not represent that it owns the Intellectual Property. Licensee shall cause all sales efforts made by it or under its direction to be courteous, dignified and in keeping with a professional, ethical and responsible business and to be in compliance with the requirements of applicable law.

**5.**    **MARKS**

    **5.1**    **Use of Marks.**

        5.1.1 Use. Licensee will use the Marks only in the conduct and operation of the Salons and in accordance with Licensor's directions and requirements, as communicated from time to time by Licensor. Licensee will not use any other trade name or marks in connection with the Salons or authorize any Sublicensee to do so. Licensee cannot use the Marks as part of Licensee's legal business name, or with other words, designs or symbols. Licensee may not use the Marks in connection with the sale of unauthorized products or services, or in any manner not authorized by Licensor. Licensee will not represent in any manner that Licensee has acquired any ownership rights in the Marks. Licensee acknowledges Licensor's ownership in the Marks. Any goodwill associated with the System and identified by the Marks (including all future distinguishing characteristics, improvements and additions to or associated with the System) is Licensor's property and shall inure directly and exclusively to the benefit of Licensor.

        5.1.2 Interest in Marks and System. Licensee will not at any time do or cause to be done, or permit Sublicensees to do or cause to be done, anything contesting or impairing Licensor's interest in the Marks or System. Licensee acquires no rights in the Marks or the System except for Licensee's right to use them and sublicense them in accordance with the express terms of this Agreement.

        5.1.3 Changes in Marks. Licensor reserves the right to delete, add to or change any of the Marks and the specifications for each for any reason whatsoever. Licensee agrees that it will promptly conform, at its own expense, to any such deletions, additions and changes, and cause the Sublicensees to do so.

        5.1.4 Defense of Marks.

            **(a)**    In the event that Licensee receives notice or learns of a claim, suit, demand or proceeding against Licensee on account of any alleged infringement, unfair competition, or similar matter relating to Licensee's use, or any Sublicensee's use, of the Marks, Licensee shall promptly notify Licensor of such claim, suit, demand or proceeding. Licensee shall have no power, right, or authority to settle or compromise any such claim by a third party without the prior written consent of Licensor. Provided that Licensee is in full compliance with this Agreement, Licensor will defend and indemnify Licensee against any claim by a third party against

5

38766626\2



Licensee for Licensee's use of the Marks in accordance with this Agreement, using lawyers of Licensor's choosing. Licensor may elect to compromise or settle any such claim, at its sole discretion. Licensee agrees to cooperate fully with Licensor in connection with any such defense. Licensee irrevocably grants Licensor authority and power of attorney to defend or settle such claims, demands, suits or proceedings.

**(b)** In the event that Licensee receives notice or is informed or learns that any third party, that Licensee believes to be unauthorized to use the Marks, is using the Marks or any variants thereof, or is using any of Licensor's copyrights, Licensee shall promptly notify Licensor. Thereupon, Licensor shall, in its sole discretion, determine whether or not it wishes to undertake any action against such third party on account of said person's alleged infringement of the Marks or copyrights. In the event Licensor undertakes such action, it shall have the authority and power of attorney to defend or settle such action. Licensee agrees to render such assistance at its own expense as Licensor shall require to carry out the prosecution of any such action. Licensee shall have no right to prosecute any claim of any kind or nature whatsoever against such alleged infringer for or on account of said alleged infringement.

5.2     **Quality Control.**

5.2.1 Notification of Complaints. Licensee will notify Licensor promptly if Licensee or any of its Sublicensees is served with a complaint in any legal proceeding that is in any way related to the Marks, the System or the Salons in the Territory.

5.2.2 Licensor-Branded Products. Licensee will obtain Licensor's prior written consent to any apparel, products, equipment, decorations or other items that Licensee sells or arranges for sale to Sublicensees that are branded with the Marks. Licensee shall pay Licensor ten percent (10%) of the revenues that Licensee receives from such sales within forty-eight (48) of receipt of such revenues. Upon request by Licensor, Licensee shall provide Licensor with an accounting of all such sales.

5.2.3 Indemnification. Licensee shall, during the term of this Agreement and after the termination or expiration of this Agreement, protect, defend, indemnify and hold Licensor, and its affiliates and associates, licensors, officers, directors, owners, employees, agents, representatives and assignees (the "**Indemnified Parties**") harmless against any and all liability for all claims of every kind or nature arising in any way out of or relating to Licensee's or Sublicensees' actions or failure to act, whether personal or in connection with the operation of Licensee's business or the Licensed Business, from the grant of sublicenses to Sublicensees, any other actions or failure to act by Licensee, Sublicensees or their respective agents or representatives or any breach of this Agreement or the representations and warranties made by Licensee in this Agreement. For purposes of this indemnification, "**claims**" means and includes all obligations, actual and consequential damages, losses, claims, judgments, demands, liens, reckonings, accounts and costs incurred in the defense of any claim (such as, by way of illustration, but not limitation, accountants', attorney's and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses) including, without limitation, claims by Sublicensees. Licensor shall have the right to defend any such claim against it with counsel of its own choosing and Licensee shall cooperate fully with Licensor in connection with the defense of any claim. Licensee shall have no right to settle or refuse to settle any claim;

6

3876662v2



Licensor shall retain all right to do so. In addition, Licensee shall cooperate fully with Licensor in any other claims brought by or against Licensor. The defense of such claim, litigation or administrative proceeding by an Indemnified Party, or by Licensee on an Indemnified Party's behalf, shall be at the sole cost and expense of Licensee, who shall hold each Indemnified Party free and harmless from all such obligations and liabilities and shall reimburse an Indemnified Party for all expenses incurred therein, including legal fees. Further, an Indemnified Party shall have the right independently to take any action it may deem necessary to protect and defend itself against any threatened action subject to indemnification hereunder, without regard to expense, forum or other parties that may be involved.

5.2.4 Insurance. Licensee shall obtain and maintain in full force and effect at all times during the term of this Agreement, at Licensee's expense, an insurance policy or policies protecting Licensee, Licensor and its affiliates, and their respective owners, directors, employees, and agents against any demand or claim with respect to personal and bodily injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring at or in connection with Licensee's conduct under this Agreement. Such policy or policies shall: (i) be written by insurers acceptable to Licensor; (ii) name Licensor and its affiliates, and their owners, directors, employees, and agents, as additional insureds; (iii) comply with the requirements prescribed by Licensor at the time such policies are obtained; and (iv) provide at least the types and minimum amounts of coverage specified from time to time by Licensor. All public liability and property damage policies shall contain a provision that Licensor, although named as an additional insured, shall nevertheless be entitled to recover under such policies any loss occasioned to Licensor or its owners, directors, employees, and agents by reason of Licensee's negligence. Upon execution of this Agreement, and thereafter at least thirty (30) days prior to the expiration of any policy, Licensee shall deliver to Licensor such evidence of insurance showing the proper types and minimum amounts of coverage. All such evidence shall expressly provide that no less than thirty (30) days' prior written notice shall be given Licensor in the event of material alteration to or cancellation or non-renewal of the coverage shown by such evidence. Such evidence of insurance shall name Licensor and its affiliates, and their respective owners, directors, employees, and agents, as additional insureds, and shall expressly provide that any interest of each shall not be affected by any breach by Licensee of any policy provisions for which such evidence of insurance demonstrates coverage.

5.3 **Sublicensees.**

5.3.1 Adequate Capitalization. Licensee shall identify Sublicensees and grant the right to operate Salons. Sublicensees must be adequately capitalized and meet the System's then-current specifications and criteria.

5.3.2 Form of Sublicense Agreements. Licensee shall enter into agreements with Sublicensees that incorporate the same provisions concerning the Marks as this Agreement and that are in a form which Licensee has provided to Licensor and for which Licensee has obtained Licensor's prior written consent (the "**Sublicence Agreements**"). Licensee may not make any changes to the Sublicense Agreement or amend existing Sublicense Agreements without Licensor's prior written consent. In particular, and not in limitation of the foregoing, the Sublicense Agreement shall provide that Licensor or its representative has the right to inspect the

7

38766626.2

Salons to evaluate whether or not the Sublicensee is utilizing the Marks in accordance with this Agreement. Sublicense Agreements shall also provide that Licensor is a third party beneficiary.

5.3.3 <u>Licensor Products</u>. . Licensee shall require Sublicensees to use and sell only nail care products manufactured by Licensor and no other nail care products. If Licensor develops other lines of health, beauty or related products, Licensee shall require Sublicensees to carry and use such products.

5.3.4 <u>Information</u>. Licensee shall provide Licensor with information about the Salons and the Sublicensees including without limitation copies of all Sublicense Agreements, operating manuals and any other information and documents, as Licensor may periodically request.

5.3.5 <u>Enforcement</u>. Licensee shall enforce the terms of the Sublicense Agreements and require Sublicensees to comply with them.

## 6. **CONFIDENTIALITY**

### 6.1 **Confidential Information.**

6.1.1 <u>Ownership</u>. Licensee acknowledges that there is information disclosed by Licensor pursuant to this Agreement and ancillary agreements and otherwise (including, without limitation, the Proprietary Information), that is proprietary, confidential or a trade secret of Licensor whether or not designated by Licensor as confidential (the "**Confidential Information**"). Licensee acknowledges that Licensor is the sole owner of all Confidential Information; that the Confidential Information is being imparted to Licensee in trust and confidence; and that the Confidential Information is not generally known to the trade or public and is not known to Licensee except by reason of such disclosure. Licensee further acknowledges that Licensee will acquire no interest in the Confidential Information other than the right to utilize it in connection with the performance of Licensee's obligations hereunder. In addition, Licensee acknowledges that the use, duplication or disclosure of the Confidential Information except as expressly permitted by this Agreement will constitute an unfair method of competition and that Licensor will suffer irreparable injury thereby.

6.1.2 <u>Confidentiality</u>. Licensee acknowledges that the Confidential Information is disclosed to Licensee solely on the condition that Licensee agrees, and Licensee hereby does agree, that Licensee: (a) will use the Confidential Information in strict accordance with the instructions and directions given by Licensor from time to time; (b) will not use the Confidential Information, directly or indirectly, in any other business or capacity; (c) will not, at any time, in any manner or form, directly or indirectly, disclose, duplicate, license, sell, reveal, divulge, publish or communicate the Confidential Information, or any portion thereof, to any person or entity other than to Sublicensees and to Licensor's and Licensee's authorized employees or consultants who need to have such information in connection with their jobs; (d) will not copy any materials containing the Confidential Information without Licensor's prior written consent; (e) will observe and implement all reasonable procedures imposed from time to time by Licensor to prevent the unauthorized use and disclosure of the Confidential Information; (f) will keep all written materials containing any portion of the Confidential Information in a secure manner and



8

38766626\2

place; and (g) if Licensee is legally compelled to disclose any of the Confidential Information, will do so only if Licensee has used Licensee's best efforts to afford Licensor the opportunity of obtaining appropriate protective orders or other assurances of confidentiality satisfactory to Licensor.

    6.1.3 <u>Work Product</u>. Licensee agrees that all documents, papers, notes and other material and work product containing or derived from the Confidential Information or connected with Licensee's conduct of the Salons, whether paper, electronic or in another medium, shall be Confidential Information. Licensee agrees that it will have no proprietary interest in any work product developed or used by Licensee and related to this Agreement. Licensee agrees, from time to time, as may be requested by Licensor, to do all things which may be necessary to establish or document Licensor's ownership of any such work product, including, without limitation, execution of assignments and waivers of moral rights.

    6.1.4 <u>Assignment of Improvements</u>. Licensee agrees to disclose promptly, and to cause its Sublicensees to disclose promptly, to Licensor any and all inventions, discoveries and improvements, whether or not patentable or copyrightable, conceived or made by Licensee, Sublicenses or their respective employees and agents related to the Salons and the System, and Licensee agrees to assign all Licensee's, and to cause its Sublicensees to assign all Sublicensees', interest therein, if any, to Licensor without compensation and waive all moral rights therein. Whenever requested to do so by Licensor, Licensee will, and will cause its Sublicensees to, execute any and all assignments or other instruments which Licensor shall deem necessary to apply for and obtain patents and copyrights or to otherwise protect Licensor's interest therein. These obligations shall continue beyond the expiration or termination of this Agreement with respect to inventions, discoveries and improvements conceived or made by Licensee, the Sublicensees and their respective employees and agents while this Agreement was in effect or related to the System.

    6.1.5 <u>Return of Confidential Material</u>. Upon the expiration or termination of this Agreement for any reason, Licensee must immediately (but in any event within five (5) days after such expiration or termination) return to Licensor all copies of any materials containing the Confidential Information (whether in original or duplicate form) and all property and equipment belonging to Licensor in Licensee's or its affiliates' possession, custody or control, including any of such items produced or prepared by Licensee.

## 7.  TRANSFER OF AGREEMENT

  **7.1**  <u>**By Franchisor.**</u> A sale, transfer or assignment by Licensor of its interest in the Intellectual Property or any parts thereof, and/or in the sale, transfer or assignment by Licensor of this Agreement or any interest therein, may be completed without the consent of Licensee. To the extent that the purchaser or assignee shall assume the covenants and obligations of Licensor under this Agreement, Licensor shall thereupon and without further agreement, be freed and relieved of all liability with respect to such covenants and obligations.

  **7.2**  <u>**By Licensee.**</u> The rights granted to Licensee under this Agreement are personal. Licensee shall not sell, transfer, assign or otherwise give to any other party this Agreement or any interest therein, including without limitation the transfer of all or part of the ownership of Licensee without Licensor's prior written consent. Any attempt at a transfer that

9

387666262

violates the provisions of this section shall constitute a material breach of this Agreement and shall convey no right or interest in this Agreement.

8. **TERMINATION**

    8.1 **Termination for Default.** Licensor shall have the right to terminate this Agreement (without prejudice to any other rights which it may have) if:

        8.1.1 Licensee commits a material default in the performance of any of its obligations, representations or warranties provided for in this Agreement; or

        8.1.2 The Distribution Agreement expires or is terminated.

    8.2 **Notice of Termination and Right to Cure.** If any of the occurrences listed in Section 8.1, Licensor may give notice of termination, such notice to be in writing to Licensee pursuant to the provisions of this Agreement, and if the occurrence is pursuant to Section 8.1.1, Licensee shall have thirty (30) days after the receipt of notice in which to cure the default giving rise to the notice. Failing such satisfactory correction, Licensor may immediately terminate this Agreement.

    8.3 **Post Termination.** Upon expiration or termination of this Agreement, all signage, logos, insignia, slogans, emblems, symbols, designs, displays, phone and other directory listings, labels, packages, advertisements and other items bearing or containing any reproduction or representation of any of the Intellectual Property shall automatically and without cost to Licensor become the property of Licensor, and, at Licensor's option, Licensee shall immediately deliver the same to Licensor's place of business or any other location designated by Licensor. In addition, upon expiration or termination of this Agreement, the Sublicense Agreements will terminate.

9. **NOTICES**

    9.1 **Notices.** All notices and other communications which either party hereto is required or may desire to give to the other shall be in writing and shall be given by addressing the same to the other at the address for each party set forth below, or at such other address as may be designated in writing by any party in a notice to the other given in the manner prescribed in this section.

| | |
|---|---|
| If to Licensor: | Tammy Taylor Nails, Inc.<br>2001 E. Deere Avenue<br>Santa Ana, California 92705<br>Fax: (949) 250-1853<br>Email: Tammytaylorttn@yahoo.com |
| If to Licensee: | Melany Juanita Viljoen and Peet Viljoen<br>_[signature]_<br>Fax:<br>Email: melve@tammytaylornails.co-zn |

10

38766620\2

All such notices shall be deemed given when sent so addressed by facsimile, email or personal delivery or two (2) business days after deposit with an overnight international courier. No objections may be made to the manner of delivery of any notice actually received in writing by an authorized agent of a party.

10. **MISCELLANEOUS**

   10.1 **Relationship Between Licensor and Licensee.** Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, or agency relationship between the parties hereto or shall be deemed to render Licensor or its representatives liable for any of the debts or obligations of Licensee. Licensee shall in no way be considered an agent or representative of Licensor in any dealings which Licensee may have with any third party and neither of the parties hereto nor any of their employees or agents shall have the power or authority to bind or obligate the other party.

   10.2 **Survival of Provisions.** The expiration or termination of this Agreement shall not affect those provisions, and the rights and obligations therein, set forth in this Agreement which either: (a) by their terms state, or evidence the intent of the parties, that the provisions survive the expiration or termination of the Agreement; or (b) must survive to give effect to the provisions of this Agreement.

   10.3 **Entire Agreement; Amendment.** This Agreement constitutes the entire agreement of the parties hereto concerning the subject matter hereof and supercedes and cancels all prior agreements, understandings and discussions between the parties, whether written, oral or implied, including without limitation, any prior agreement (whether or written or by course of dealing) except for the Distribution Agreement. This Agreement cannot be amended, altered or modified except by a written instrument executed by both parties hereto.

   10.4 **No Waiver.** The failure or delay of either party to insist in any one or more instances upon performance of any of the provisions of this Agreement or to take advantage of any of its rights hereunder shall not be construed as a waiver of any such provisions or the relinquishment of any such rights, and the same shall continue and remain in full force and effect. No single or partial exercise by either party of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

   10.5 **Severability.** In the event any word, phrase, clause, sentence or other provision of this Agreement shall violate any applicable statute or rule of law in any particular circumstance or governing jurisdiction, such provision shall be ineffective to the extent of such violation, without in any way invalidating or affecting the enforceability of such provision in any other jurisdiction or circumstance or of any other provision of this Agreement.

   10.6 **Headings.** The headings as to contents of particular provisions herein are inserted only for convenience and are in no way to be construed as part of this Agreement or as a modification of the scope of any terms or provisions of this Agreement.

   10.7 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be considered an original.

11

38766626:2

11. **VENUE AND CHOICE OF LAW**

11.1 Each party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against any other party in any way arising from or relating to this Agreement and all contemplated transactions, including, but not limited to, contract, equity, tort, fraud and statutory claims, in any forum other than the United States District Court for the Southern District of California or, if such court does not have subject matter jurisdiction, the courts of the State of California sitting in Orange County, and any appellate court from any thereof. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in the United States Southern District Court for the State of California or, if such court does not have subject matter jurisdiction, the courts of the State of California sitting in Orange County. Each party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

11.2 This Agreement is governed by, and shall be construed and enforced in accordance with, the laws of the State of California, without giving effect to any conflict of laws rules, and each party irrevocably submits to the exclusive jurisdiction of the federal and state courts located in the State of California for the purposes of any action or proceeding arising out of or relating to this Agreement. Each party hereby waives any objection based on *forum non conveniens* and waives any objection to venue of any action instituted hereunder. If any legal action or any arbitration or other proceeding is brought in connection with this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees, accounting fees, and other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled. FOR PURPOSES OF ANY SUCH COURT PROCEEDINGS, EACH PARTY AGREES, AFTER CONSULTATION WITH ITS COUNSEL, THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE, AND NOT A JURY, AND EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BEFORE A JURY.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal as of Effective Date.

LICENSOR:
TAMMY TAYLOR NAILS, INC.

By: *Tammy Taylor*
Name:
Title: *President/CEO*

LICENSEE:

Melany Juanita Viljoen

Peet Viljoen

# EXHIBIT A

# DEED OF ASSIGNMENT

## SOUTH AFRICA

**THIS DEED** entered into **BETWEEN**:

**Justsmart Mobile (Proprietary) Limited**, a South African company of Menlyn Woods, Building 1, 291 Spite Avenue, Menlyn, Pretoria, Gauteng, Republic of South Africa

("the **ASSIGNOR**")

and

**Tammy Taylor Nails, Inc.**, a California corporation of 2001 E. Deere Avenue, Santa Ana, California 92705, United States of America

("the **ASSIGNEE**")

**WHEREAS**:

a) The **ASSIGNOR** is the registered proprietor in respect of the trade mark applications appearing in the attached schedule ("the trade marks");

and

b) The **ASSIGNOR** and the **ASSIGNEE** have agreed that the trade marks shall be assigned and transferred to the **ASSIGNEE**.

**THEREFORE, THIS DEED WITNESSES THAT:**

For good and sufficient consideration, the **ASSIGNOR** hereby assigns and transfers to the **ASSIGNEE** all its right, title and interest in and to the trademarks with the goodwill of the business concerned in the goods and/or services for which the trademarks will become registered. The effective date of this assignment is __14 Nov 2018__ [Please insert effective date].

Pretoria -

The **ASSIGNEE** hereby confirms acceptance of the assignment and transfer as aforesaid.

**IN WITNESS WHEREOF** the parties hereto have executed this Deed as follows:

A-1

38766626:2

SIGNED at Pretoria this 14 day of November 2018 on behalf of the **ASSIGNOR** by the undersigned authorized representative:

_____
SIGNATURE

Name in print: Melany Viljoen

Title: _____

SIGNED at Irvine, California this _____ day of _____, 2018 on behalf of the **ASSIGNEE** by the undersigned authorized representative:

_____
SIGNATURE

Name in print: Tammy Taylor

Title: President/CEO

38766626.2