1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11 | TAMMY TAYLOR NAILS, INC.,

12 |                        Plaintiff,

13 |     v.

14 | MELANY VILJOEN, PEET VILJOEN,
TAMMY TAYLOR GLOBAL

15 | FRANCHISING, and DOES 1
THROUGH 10,

16

17 |                       Defendants.

18

Case No. 24-cv-0624-BAS-DTF

**ORDER**
1. **GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT (ECF No. 17), AND**
2. **GRANTING MOTION TO SEAL (ECF No. 24)**

19       Plaintiff, a California corporation focused on nail care products and service, brought

20 suit against Defendants for various trademark infringement and breach of contract claims.

21 After Defendants failed to respond or otherwise appear in the case, Plaintiff moved for

22 default judgment, (ECF No. 17), and moved to seal portions of the exhibits to its motion,

23 (ECF No. 24). For the following reasons, the Motion for Default Judgment is **GRANTED**

24 **IN PART** and **DENIED IN PART**, and Plaintiff's Motion to Seal is **GRANTED**.

25 **I.    BACKGROUND**

26       Plaintiff Tammy Taylor Nails ("TTN" or "Plaintiff") is a California corporation that

27 "manufactures and sells high quality, beautiful nail and skincare products that are designed

28 to last." (ECF No. 5 ¶¶ 5, 10.) The business was founded in 1981 and has numerous

trademarks registered in the United States and South Africa. (*Id.* ¶¶ 10–11.) It was named after its creator and owner, Tammy Taylor. (*Id.* ¶ 10.)

TTN owns various common-law trademark rights in the United States, including a trademark for a stylized oval double "T" mark ("Oval Double T Mark") (see below). (*Id.* ¶ 22.)



*TTN's U.S. common-law Oval Double T Mark*

TTN has used this Oval Double T Mark in the United States continuously in advertising and on products since 2011. (*Id.* ¶ 22.)

TTN also owns a stylized mark in South Africa ("the South African Mark"), which is registered as a mark for several products, including nail care products as well as online and wholesale store service for nail care products. (*Id.* ¶¶ 18–20; *id.*, Exs. G–I.)

TTN also owns several registered word marks in the United States (collectively, "the U.S. Registered Marks") for nail care products and services as well as retail, online retail and wholesale store services featuring nail care preparation and products. (*See id.*, Ex. A (containing the U.S. registration for the word mark "TAMMY TAYLOR" for nail care products); *see also id.*, Ex. B (containing the U.S. registration for the word mark "TAMMY TAYLOR" for manicure services, nail care services, and pedicure services); *see also id.*, Ex. C (containing the U.S. registration for the word mark "TAMMY TAYLOR" for retail, online retail and wholesale store services featuring nail care preparation and products); *see also id.*, Ex. D (containing the U.S. registration for the word mark "TAMMY TAYLOR NAILS" for retail, and wholesale store services featuring cosmetics, nail products, and body and hair care products).) TTN first used the U.S. Registered Marks in commerce in

the United States in 1985. (*Id.* ¶ 23.) In all cases, TTN's use of its various registered trademarks preceded Defendants' use of them. (*Id.*)

In April 2017, TTN entered into an International Distribution Agreement (the "Distribution Agreement") with two of the defendants: Melany and Peet Viljoen ("the Viljoens"). (*Id.* ¶¶ 10, 27; *id.*, Ex. J.) The Distribution Agreement granted the Viljoens the right to distribute TTN products in Australia and Africa. (*Id.* ¶ 27; *id.*, Ex. J.) With this, the Viljoens gained the limited ability to use TTN's trademarks "solely in connection with the promotion, advertising, and distribution of the Products" within these designated regions and for the period of the Distribution Agreement. (*Id.* ¶¶ 27–28 (quoting *id.*, Ex. J).) An additional clause stated that upon termination of the Distribution Agreement, the Viljoens would not be permitted to continue using any of TTN's marks. (*Id.* ¶ 29; *id.*, Ex. J.)

A year and a half after entering into the Distribution Agreement, TTN entered into a Master License Agreement (the "License Agreement") with the Viljoens, giving them rights to use TTN's U.S. Registered Marks (as well as other related trademarks) and TTN's system for operating nail salons so the Viljoens could open nail salons in Africa under the Tammy Taylor Nails name. (*Id.* ¶¶ 10, 30; *id.*, Ex. K.) The License Agreement also required the Viljoens to acknowledge that TTN owned the trademarks, including the U.S. Registered Marks and the Oval Double T Mark. (*Id.* ¶ 31; *id.*, Ex. K.) Like the Distribution Agreement, the License Agreement revoked the Viljoens' rights, and any sublicenses they had granted, whenever the License Agreement was terminated. (*Id.* ¶ 32; *id.*, Ex. K.) After TTN and the Viljoens entered into this License Agreement, though, their business relationship quickly disintegrated. By April 2022, TTN had terminated both the License and the Distribution Agreements (collectively, "the Agreements"), effectively terminating the Viljoens' rights under the Agreements. (*Id.* ¶ 33.)

Since concluding the relationship between TTN and the Viljoens, the Viljoens "continue to hold themselves out as 'Tammy Taylor Nails' and sell nail products under the TTN name and trademarks—all without TTN's authorization." (*Id.* ¶¶ 10, 34.) Last year,

24cv0624

the Viljoens escalated their infringement by starting the defendant entity, Tammy Taylor Global Franchising, "to sell purported franchises bearing the Tammy Taylor name and purported products," all without TTN's authorization, infringing on TTN's name and trademarks, and breaching both the Distribution and License Agreements. (*Id.* ¶¶ 8, 10, 35.) Defendants have advertised Tammy Taylor Global Franchising with a billboard in Times Square and by offering global franchises on their website https://tammytaylornails.org.za (the "Website"). (*Id.* ¶ 35; *see also* ECF No. 20, Ex. 28 at 145 (showing a website, registered to Tammy Taylor Global Franchising, offers an opportunity to "OWN A FRANCHISE".)) In addition to selling "Tammy Taylor" franchises, Defendants are selling nail products that are inferior to TTN's products but improperly bear the TTN marks. (ECF No. 5 ¶ 42.)

While TTN is a California corporation with its principal place of business in California (*Id.* ¶ 5), the two individual defendants, Melany and Peet Viljoen, are each domiciled in South Africa, and Tammy Taylor Global Franchising is an entity formed in South Africa with its principal place of business located there (*Id.* ¶¶ 6–8).

Plaintiff filed its Complaint on April 2, 2024, and then filed its First Amended Complaint ("FAC") on April 22, 2024. (ECF Nos. 1, 5.) Plaintiff attempted service on May 16, 2024. (ECF Nos. 6–8.) On June 24, 2025, the Clerk entered default against Defendants. (ECF No. 10.) Plaintiff now seeks default judgment against Defendants. (ECF No. 17.) The Court then requested and received supplemental briefing on personal jurisdiction. (ECF Nos. 21–22, 26.)

## II.    REQUEST FOR JUDICIAL NOTICE

Along with its Motion for Default Judgment, Plaintiff submitted a Request for Judicial Notice. (ECF No. 17-40.) Plaintiff requests the Court take judicial notice of the Viljoens' Application for Trademark, Serial Number 97806785, which ultimately is registered at U.S. Registration No. 7,322,502, (ECF No. 20, Ex. 36), and of the trademark registration certificate from the United States Patent and Trademark Office for Registration No. 7,322,502, (ECF No. 20, Ex. 37).

Under Federal Rule of Evidence 201, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Materials in the online files of the United States Patent and Trademark Office and other matters of public record are proper subjects of judicial notice. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record." (citation omitted)). The Court therefore takes judicial notice of Exhibits 36 and 37 to the Motion for Default Judgment.

## III. MOTION TO SEAL

Plaintiff seeks to seal limited portions of two exhibits attached to its Motion for Default Judgment. (*See* ECF No. 24 (seeking to seal portions of Exhibit 11 to Karl J. Schulze's Declaration and Exhibit 38 to Patrick W. Kelly's Declaration).)[1]

When it comes to court records, courts adhere to a strong presumption in favor of public access. *See, e.g.*, *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) ("[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." (citation omitted)); *see also Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) ("Unless a particular court record is one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting point."); *see also Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) ("The presumption of access is based on the need for federal courts, although independent . . . to have a measure of accountability and for the public to have confidence in the administration of justice." (citation omitted)).

Thus, a party seeking to seal a judicial record bears the burden of overcoming this strong presumption of access. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). The heft of that burden depends on the type of motion tied to the documents

---

[1] Plaintiff neglected to withdraw its initial Motion to Seal. (ECF No. 23.) The Court therefore **VACATES** the Motion. (*Id.*)

24cv0624

sought to be sealed. When the related information is more than "tangentially related to the merits of the case," the more rigorous "compelling reasons" standard applies. *Chrysler*, 809 F.3d at 1096–98, 1102. If the related information is not more than tangentially related to the merits of the case, the more relaxed "good cause" standard applies. *Id.* at 1096–98.

A motion for default judgment is more than "tangentially related to the merits of the case," and therefore the more rigorous "compelling reasons" standard applies. *Chrysler*, 809 F.3d at 1096–98, 1102. Plaintiff cites both attorney-client privilege and confidential customer information as reasons for the tailored redactions in the two exhibits. (ECF No. 23 at 5–7.) Each of these rationales constitutes a compelling reason to seal information. *Hanson v. Wells Fargo Home Mortg., Inc.*, No. C13-0939JLR, 2013 WL 5674997, at *3 (W.D. Wash. Oct. 17, 2013) (collecting cases where courts found attorney-client privilege presents a compelling reason for sealing); *see also In re Elec. Arts, Inc.*, 298 F. App'x 568, 569 (9th Cir. 2008) (holding that confidential customer information meets the compelling reason standard for sealing). Accordingly, Plaintiff's Motion to Seal is granted. (ECF No. 24.)

## IV.    MOTION FOR DEFAULT JUDGMENT

Generally, after entry of default, a party is entitled to apply to the court for default judgment when a party has failed to plead or defend. Fed. R. Civ. P. 55(b)(2). Upon entry of default, the factual allegations in a plaintiff's complaint, except those relating to damages, are deemed admitted. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987) (citation omitted).

When ruling on a motion for default judgment, "a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties" given that "[a] judgment entered without personal jurisdiction over the parties is void." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). "The Court is also required to assess the adequacy of the service of process on the party against whom default is requested." *DFSB Kollective Co. v. Bourne*, 897 F. Supp. 2d 871, 877 (N.D. Cal. 2012) (citation omitted).

24cv0624

Once the court has satisfied itself as to the procedural considerations and jurisdiction, entry of default judgment is within the trial court's discretion. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In exercising this discretion, the Court considers the following factors: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning the material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

## A. Procedural Considerations

As an initial matter, Plaintiff has appropriately obtained entry of default against Defendants. Pursuant to Federal Rule of Civil Procedure ("Rule") 55(a), the Clerk of the Court correctly entered default against Defendants because they have not appeared in the case. (ECF No. 10.) Thus, the Court, in its discretion, may order a default judgment after confirming jurisdiction and balancing the *Eitel* factors.

### 1. Subject-Matter Jurisdiction

As to jurisdiction, federal subject-matter jurisdiction may exist due to the presence of a federal question, 28 U.S.C. § 1331, complete diversity between the parties, 28 U.S.C. § 1332, or supplemental jurisdiction, 28 U.S.C. § 1367(a). Plaintiff alleges several claims under federal law, including the Lanham Act. (ECF No. 5 ¶ 1.) "When federal law applies . . . it follows that the question arises under federal law, and federal question jurisdiction exists." *New SD, Inc. v. Rockwell Int'l Corp.*, 79 F.3d 953, 955 (9th Cir. 1996). Accordingly, this Court has federal question jurisdiction over Plaintiff's claims arising under federal law.

A federal court has diversity jurisdiction over a non-federal claim where there is complete diversity of parties and the amount in controversy exceed $75,000. 28 U.S.C. § 1332(a). Plaintiff here alleges complete diversity of the parties—Plaintiff is a California corporation with its principal place of business in California. (ECF No. 5 ¶ 5.) Both

- 7 -

individual defendants are domiciled and reside in South Africa. (*Id.* ¶¶ 6–7.) The corporate defendant, Tammy Taylor Global Franchising, is a South African entity with its principal place of business in South Africa. (*Id.* ¶ 8.) Therefore, complete diversity of parties exists. Further, the amount in controversy exceeds $75,000, plus attorney's fees and costs. It follows that, for the claims that are not federal question claims, the Court retains diversity jurisdiction.

As to the South African Mark, however, the Court finds it does not have subject-matter jurisdiction. Plaintiff makes no argument as to why or how the Court may have jurisdiction over the South African Mark and so the Court denies in part, without prejudice, all claims related to Plaintiff's South African Mark. The Lanham Act does not apply extraterritorially and only applies to commerce Congress may lawfully regulate. *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 419 (2023). Indeed, no statute applies extraterritorially unless there is an express statement of extraterritoriality or another clear indication that it applies abroad. *Id.* at 420. The Court is thus unconvinced that it has the power to adjudicate any of Plaintiff's claims as they relate to its South African Mark used in South Africa, but Plaintiff is free to renew its Motion as to the South African Mark to make its arguments for why this Court may have subject-matter jurisdiction over such claims.

### 2.    Service of Process

Service of process is a prerequisite for personal jurisdiction over a defendant. *See Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982) ("Defendants must be served in accordance with . . . the Federal Rules of Civil Procedure, or there is no personal jurisdiction."). "Neither actual notice, nor simply naming the person in the caption of the complaint, will subject defendants to personal jurisdiction if service was not made in substantial compliance with Rule 4." *Id.* (citations omitted). Specifically, Rule 4(f) governs service on an individual in a foreign country. The Viljoens reside in South Africa and therefore Rule 4(f) governs appropriate service of process procedure. (ECF No. 5 ¶¶ 6–7.)

24cv0624

Rule 4(f) offers several possible methods for effecting service on an individual in a foreign country. For instance, an individual may be served "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." Fed. R. Civ. P. 4(f)(1). Because Plaintiff does not cite to, nor could this Court discover, an internationally agreed-upon means of service (entered into by both the United States and South Africa) by which Plaintiff could serve the Viljoen Defendants, Rule 4(f)(1) does not apply.

Fortunately, Rule 4(f)(2)(A) allows service on a party in a foreign country so long as that service is executed in accordance with the "the foreign country's law for service in that country in an action in its courts of general jurisdiction." The Court therefore examines sufficiency of service under South Africa's laws as to each Defendant.

The Viljoen Defendants. South African law permits personal service. Rule 4 of the South African Uniform Rules of Court ("Uniform Rules") governs service of process and provides for various means of service in courts of general jurisdiction in South Africa. Of relevance here, Uniform Rule 4(1)(a) provides that service of any process of the court be directed to the sheriff and that a sheriff effects service by delivering a copy to a named defendant personally, Uniform Rule 4(1)(a)(i), or that a sheriff may effect service "by delivering a copy thereof at the place of employment of the said person, . . . to some person apparently not less than sixteen years of age and apparently in authority over him;" Uniform Rule 4(1)(a)(iii).

The Viljoen Defendants have each been served in accordance with Universal Rule 4. Peet Viljoen was personally served by a sheriff in Menlyn, South Africa. (ECF No. 7.) The sheriff attests Peet Viljoen was served with the civil summons, report on the filing or determination, the Complaint, the FAC, and disclosure statement. (*Id.*) The contents of the sheriff's affidavit show service upon Peet Viljoen complied with Uniform Rule 4's requirements as contained in Uniform Rule 4(1)(b)–(d). Service took place at a permissible time. (*Compare* ECF No. 7 (showing service took place at 10:31), *with* Uniform Rule

4(1)(b) (requiring service be effected "as near as possible between the hours of 7 a.m. and 7 p.m.).) Service did not take place on a Sunday. (*Compare* ECF No. 7 (showing service took place on May 16, 2024, a Thursday), *with* Uniform Rule 4(1)(c) (requiring service not take place on a Sunday unless otherwise directed by a court or judge).) And, the nature and contents of the served documents were explained to Peet Viljoen. (*Compare* ECF No. 7 ("[T]he nature and contents thereof [were] explained to [Peet Viljoen]"), *with* Uniform Rule 4(1)(d) ("It shall be the duty of the sheriff or other person serving the process or documents to explain the nature and contents thereof to the person upon whom service is being effected and to state in his return or affidavit or on the signed receipt that he has done so.).) That Peet Viljoen evidently refused to sign does not appear to have an impact on the legitimacy of service of process. *See generally* Uniform Rule 4.

The affidavit attesting to service upon Melany Viljoen is virtually identical except that service took place via substitute service upon Peet Viljoen, evidently in compliance with Uniform Rule 4(1)(a)(iii), wherein a sheriff effects service by leaving a copy of the documents with a person in charge at the location. (*See* ECF No. 6 (attesting that the sheriff served the documents upon "MR P VILJOEN" (Peet Viljoen) and identifies him as the "HUSBAND" before noting service was completed in accordance with "[Universal] Rule 4(1)(a)(iii)").) Because this substitute service took place at virtually the same moment as service upon Peet Viljoen, and the contents of the affidavit are nearly identical, minus the language regarding substitute service, service of process likewise appears to have complied with Uniform Rule 4.

Accordingly, under Federal Rule of Civil Procedure 4(f)(2)(A), the Viljoens were served "as prescribed by [South Africa's] law for service in [South Africa] in an action in its courts of general jurisdiction." Therefore, under Federal Rule of Civil Procedure 4(l)(2)(B), the Court is satisfied that the summons and complaint were properly served upon the Viljoens.

24cv0624

_Tammy Taylor Global Franchising_. As it served the Viljoens, Plaintiff appears to have served Tammy Taylor Global Franchising in accordance with South Africa's rules directing service. Uniform Rule 4 also governs service on a corporation as follows:

> in the case of a corporation or company, by delivering a copy to a responsible employee thereof at its registered office or its **principal place of business** within the court's jurisdiction, or if there be no such employee willing to accept service, by affixing a copy to the main door of such office or place of business, or in any manner provided by law.

Uniform Rule 4(1)(a)(v) (S. Afr.) (emphasis added).

Service of process on Tammy Taylor Global Franchising apparently took place contemporaneously with service on the Viljoens. (_See_ ECF No. 8.) Having now had the benefit of supplemental briefing, the Court determines the address where Tammy Taylor Global Franchising was served, via Peet Viljoen who is an employee of Tammy Taylor Global Franchising, was indeed the principal place of business of the corporation. (ECF No. 26, Exs. 40–41.) Plaintiff has met the requirements for service upon a corporation in South Africa.

Having determined that service was proper as to each Defendant, the Court turns to the question of personal jurisdiction as to each Defendant and each claim. _Action Embroidery Corp. v. Atl. Embroidery, Inc._, 368 F.3d 1174, 1180 (9th Cir. 2004) ("Personal jurisdiction must exist for each claim asserted against a defendant." (citation omitted)).

### 3.    Personal Jurisdiction

Federal courts generally follow the forum state's law in determining the limits of their jurisdiction over individuals. _Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A._, 972 F.3d 1101, 1106 (9th Cir. 2020) (citation omitted). California's long-arm statue requires compliance with due process. Cal. Civ. Proc. Code § 410.10.

Parties may consent to personal jurisdiction in a forum via "a 'variety of legal arrangements' by which a litigant may give 'express or implied consent to the personal jurisdiction of the court.'" _Burger King Corp. v. Rudzewicz_, 471 U.S. 462, 472 n.14 (1985) (citation omitted). This includes consenting to a court's jurisdiction by contract. _See id._

24cv0624

1   ("[P]arties frequently stipulate in advance to submit their controversies for resolution
2   within a particular jurisdiction."); *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–
3   16 (1964) ("[P]arties to a contract may agree in advance to submit to the jurisdiction of a
4   given court.").

5          Where parties have not consented to jurisdiction in a particular forum, courts analyze
6   personal jurisdiction through two frameworks: general and specific jurisdiction. *Daimler*
7   *AG v. Bauman*, 571 U.S. 117, 118 (2014). Plaintiff has already conceded that none of the
8   defendants is subject to general jurisdiction here. (ECF No. 26 at 3.) Therefore, the Court
9   analyzes specific jurisdiction alone.

10         Specific jurisdiction attaches to "a narrower class of claims" than those subject to
11  general jurisdiction. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359
12  (2021). To hale a nonresident defendant into court under a specific jurisdiction theory, the
13  defendant must have sufficient "minimum contacts" with the forum to comport with due
14  process; that is, the defendant's "suit-related conduct must create a substantial connection
15  with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). In determining whether
16  specific jurisdiction applies, courts undertake a three-prong analysis: "(1) the defendant
17  must either 'purposefully direct his activities' toward the forum or 'purposefully avail
18  himself of the privileges of conducting activities in the forum'; (2) the claim must be one
19  which arises out of or relates to the defendant's forum-related activities; and (3) 'the
20  exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be
21  reasonable.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir.
22  2017) (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)). "The
23  plaintiff bears the burden of satisfying the first two prongs of the test." *Schwarzenegger v.*
24  *Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). If the plaintiff meets its burden,
25  the defendant then bears the burden of showing that the exercise of jurisdiction would be
26  unreasonable. *Id.*

27         Sometimes where a court otherwise does not have personal jurisdiction over a party
28  as to a particular claim, the court may choose to assert pendent jurisdiction over that claim.

To do so, the claim subject to pendent jurisdiction must arise out of a common nucleus of operative facts with a claim in the same suit over which the court has specific jurisdiction. *Action Embroidery Corp.*, 368 F.3d at 1180.

            **i.**      **Consent to Personal Jurisdiction: Breach of Contract Claims**

Plaintiff's breach of contract claims are alleged against only the Viljoen Defendants. From the outset, Plaintiff notes that the Viljoens consented to this Court's jurisdiction regarding claims concerning the Agreements when they signed the Agreements, which each contained a forum selection clause. (ECF No. 17 at 17–18 n.2.) Indeed, Tammy Taylor ("Taylor") attests that she signed the Distribution Agreement and the License Agreement along with the Viljoens. (ECF No. 17-1, Taylor Decl. ¶¶ 10, 12.) Plaintiff has included copies of these Agreements as Exhibits 24 (the Distribution Agreement) and 25 (the License Agreement). The Distribution Agreement forum selection clause reads, "each party irrevocably submits to the exclusive jurisdiction of the federal and state courts located in the State of California for the purposes of any action or proceeding arising out of or relating to this Agreement." (ECF No. 20, Ex. 24 at § 14(b).) The License Agreement employs identical language. (*Id.*, Ex. 25 at § 11.2.)

"Forum selection clauses are presumptively valid." *Melendez v. Vaiana*, No. EDCV 16-2516 JGB (SPx), 2017 WL 8183139, at *3 (C.D. Cal. Oct. 19, 2017) (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)); *see also Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 325 (9th Cir. 1996) ("Although *Bremen* is an admiralty case, its standard has been widely applied to forum selection clauses in general.") The Ninth Circuit has further recognized that the acceptance of a forum selection clause constitutes consent to personal jurisdiction in the identified forum. *S.E.C. v. Ross*, 504 F.3d 1130, 1149 (9th Cir. 2007).

The Court sees no reason to find the Agreements' forum selection clauses as anything other than valid. Accordingly, this Court has personal jurisdiction over each of the Viljoens as to the breach of contract claims.

24cv0624

### ii.     Specific Jurisdiction: Federal Claims

Plaintiff claims there is specific personal jurisdiction over all Defendants for the federal claims through nationwide jurisdiction, which is governed by Rule 4(k)(2). To satisfy Rule 4(k)(2), the plaintiff must show: (1) that the claim against the defendant arises under federal law, (2) that the defendant is not subject to personal jurisdiction in any one state's courts of general jurisdiction, and (3) that the exercise of personal jurisdiction comports with due process. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006).

The first two factors are easily met—Plaintiff alleges federal claims and Defendants are not subject to any court of general jurisdiction in the United States. The Viljoens are citizens of South Africa and Tammy Taylor Global Franchising has its principal place of business and is incorporated there. Rule 4(k)(2)'s third factor, due process, requires a harder look.

To determine whether the exercise of personal jurisdiction comports with due process under Rule 4(k)(2), the Court looks at the following factors: (1) whether the defendant has engaged in purposeful activities or transactions with the United States, with an act that shows defendant purposefully availing itself of the privileges of doing business in the United States, and thereby invoking the benefits and protections of its laws; (2) whether the claim arises out of activities that are related to the United States; and (3) whether the exercise of jurisdiction must comport with notions of fair play and substantial justice. *Lang Van, Inc. v. VNG Corp.*, 40 F.4th 1034, 1041 (9th Cir. 2022). Contrary to Plaintiff's arguments, due process is not satisfied if the defendant simply knows the plaintiff has ties to the forum and the defendant harms the plaintiff. *Walden*, 571 U.S. at 290.

### a.     Purposeful Direction

An analysis "under the 'purposeful availment or direction' prong of the specific jurisdiction test turns on the nature of the underlying claims." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 979 (9th Cir. 2021) (citing *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136,

24cv0624

1142 (9th Cir. 2017)). Claims based in tort require a purposeful direction analysis, and trademark claims like the ones asserted here are considered "tort-like for personal jurisdiction purposes." *Ayla, LLC*, 11 F.4th at 979 (citation omitted). Courts determining purposeful direction use the *Calder* effects test to decide whether a defendant has purposefully directed activities toward a forum state. *Burri L. PA v. Skurla*, 35 F.4th 1207, 1213 (9th Cir. 2022) (citing *Calder v. Jones*, 465 U.S. 783, 788–89 (1984)).

The *Calder* effects test is a three-part test requiring that the defendant have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citation omitted). All three components must be met for a defendant to have purposefully directed its activities toward the forum state. *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 577 (9th Cir. 2018). Rather than considering a defendant's contacts with just one state, in a Rule 4(k)(2) analysis the Court considers each defendant's contacts with the nation "as a whole." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 462 (9th Cir. 2007) (citing *Pebble Beach Co.*, 453 F.3d at 1159).

The Court requested and received supplemental briefing as to whether Defendants' contacts related to each of the federal claims were sufficient to survive the *Calder* effects test. (ECF Nos. 21–22, 26.) The Court has no concerns that Defendants acted intentionally in every relevant respect in this case and no concerns that they caused harm knowing it would be suffered in the United States, given that Plaintiff is based in the United States. Therefore, the first and third elements of *Calder* are satisfied and the analysis turns on the second element: express aiming.

Defendants have expressly aimed at the United States. The Viljoens entered into two contracts here with Plaintiff, opting into the jurisdiction of California courts and have registered a trademark here. Further, all Defendants have advertised the Website through a billboard in the United States (ECF No. 5 ¶ 35; ECF No. 20, Ex. 29), have used the Website to sell the allegedly infringing products into the United States (ECF No. 5 ¶ 61), and have

24cv0624

geotagged a location in the United States in their Instagram post highlighting the billboard (ECF No. 20, Ex. 29). The sale of products on the Website into the United States is of particular importance to the analysis.

As early as 1997, the Ninth Circuit held that the mere passive nationwide accessibility of a website is not enough to show express aiming at a forum state. *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414 (9th Cir. 1997). However, a defendant may expressly aim at a forum where it has an interactive website and "something more to indicate that the defendant purposefully (albeit electronically) directed [its] activity in a substantial way to the forum state." *Id.* at 418.

This "something more" has taken various shapes in the intervening years since *Cybersell*. For instance, in *Rio Properties, Inc. v. Rio International Interlink*, the panel found "something more" where the web-based defendant directly targeted the forum through radio and print advertisements in the forum. 284 F.3d 1007, 1020–21 (9th Cir. 2002). Then, in *Mavrix Photo*, the court found the "something more" where the Ohio-headquartered defendant exploited the California market for its own commercial gain and cultivated a nationwide audience in addition to selling products into California. 647 F.3d at 1229–30. Most relevant to this case, the Ninth Circuit in *Herbal Brands* found the "something more" for express aiming where defendants, in their regular course of business, sold a physical product via an interactive website and caused that product to be delivered into the forum state. *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1094 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 693 (2024). That the sales of the products were not random or isolated, and that the defendant's online storefront permitted a "high volume of sales throughout the [United States]," constituted express aiming. *Id.* at 1094–95.

If Defendants had appeared in this case, the Court would be able to order discovery as to the precise scope of the Website's sales and thus develop the kind of factual record before the panel in *Herbal Brands*. Because Defendants have refused to appear here, though, Plaintiff and the Court are deprived of this information. That Defendants' Website

24cv0624

sold products into the United States is enough on its own to demonstrate express aiming[2] even apart from the Viljoen Defendants' additional contacts with the United States. (ECF No. 5 ¶ 61); *see Rodriguez v. Aquatic Sales Sols. LLC*, 735 F. Supp. 3d 1208, 1224 (C.D. Cal. 2024) (holding that because the defendant operated an interactive website and sold products into California, the defendant expressly aimed at California); *see also Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732, 742 (N.D. Cal. 2023) (holding there was express aiming at California where the plaintiff could show that the defendant sold a physical product to him in the forum through its interactive website).

Having found that the Viljoen Defendants acted intentionally, expressly aimed at the United States, and caused harm in the United States, the Court finds Defendants purposefully directed their conduct at the United States.

### b.    Arise Out of or Relate to Forum Activities

The second prong of the minimum contacts inquiry considers whether the plaintiff's claims "'arise out of or relate to the defendant's contacts with the forum.'" *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017)). "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Id.* at 1026. Each of Plaintiff's federal claims arises out of and relates to Defendants' contacts with the forum, the United States. The trademark infringement and counterfeiting all occur on the Website that permits sale of these infringing products into the United States. (ECF No. 20, Ex. 30.) The trademark cancellation claim arises out of a trademark the Viljoen Defendants registered with the United States Patent and Trademark Office. (*Id.*, Exs. 36–37.) Accordingly, this element of due process is satisfied.

---

[2] As an aside, that the Website uses a ".za" domain name instead of a ".com" domain name bears little relevance on this analysis because it "does not establish to whom the website is directed." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006).

### c.    Reasonableness

Once the plaintiff satisfies the first two prongs of the due process analysis, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King Corp.*, 471 U.S. at 476–78). Defendants have not appeared and have not objected to the exercise of personal jurisdiction over them. By failing to appear in this matter, Defendants have thus conceded that the exercise of personal jurisdiction over them is reasonable. *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1094 (N.D. Cal. 2014); *Ripple Servs., Inc. v. Betur Inc.*, No. 23-CV-06215-LJC, 2024 WL 5396570, at *2 (N.D. Cal. Dec. 5, 2024), *report and recommendation adopted,* No. 23-CV-06215-JSC, 2025 WL 908042 (N.D. Cal. Feb. 4, 2025). Nonetheless, the Court has considered this factor and finds that the exercise of personal jurisdiction is reasonable. The Court does so by balancing the following factors:

> (1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Rio Properties, Inc.*, 284 F.3d at 1021. The balance of these factors shows that the exercise of personal jurisdiction is reasonable. Defendants purposefully directed their activities at the United States. There is no evidence of any burden on Defendants in defending themselves in this Court or conflicts with the sovereignty of a foreign state. The United States has an interest in ensuring that Plaintiff's valid intellectual property rights are protected, and this forum can efficiently resolve the conflict. Last, Plaintiff has an interest in obtaining convenient and effective relief in this Court where there are no alternative fora identified. The Court finds the exercise of personal jurisdiction over Defendants to be reasonable and that the Court has specific jurisdiction over Defendants as to Plaintiff's federal claims.

24cv0624

### iii.    Pendent Jurisdiction: Common-law Trademark Claim

Plaintiff alleges Defendants infringed upon Plaintiff's common-law trademark of the Oval Double T Mark. For the Court to exercise personal jurisdiction over Defendants as to this claim, Plaintiff must demonstrate why a court in *California* would have jurisdiction over Defendants as to this claim. Instead of analyzing contacts with the nation as a whole, the Court considers contacts only with California, the forum state. *See Schwarzenegger*, 374 F.3d at 800–01.

Here, Plaintiff alleges virtually no contacts by Defendants with California apart from the Viljoen Defendants signing the two Agreements with Plaintiff, a California company. However, the claim for breach of a common-law trademark is not related to these contacts, nor does it arise out of these contacts. Because Plaintiff also alleges no contacts by Tammy Taylor Global Franchising with California, this Court does not have independent personal jurisdiction over any of Defendants as to Plaintiff's common-law trademark claim.

Nonetheless, the Court finds it has personal jurisdiction over this claim through the doctrine of pendent personal jurisdiction. "A court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery Corp.*, 368 F.3d at 1180. "Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction." *Id.*

The common-law trademark infringement claim has a common nucleus of operative fact with the federal claims over which this Court has nationwide personal jurisdiction. The counterfeit products bearing Plaintiff's federally registered trademarks also bore Plaintiff's common-law Oval Double T Mark. (ECF No. 20, Exs. 21–22.) This Court therefore exercises its discretion to assert pendent personal jurisdiction over this claim against all Defendants.

24cv0624

Upon finding that the procedural requirements are satisfied, a district court has discretion to enter default judgment where appropriate. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

## B. The *Eitel* Factors

"A defendant's default does not automatically entitle the plaintiff to a court-ordered judgment." *PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002). In exercising discretion, a court must consider the *Eitel* factors. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

Upon consideration of Plaintiff's FAC and the materials provided by Plaintiff in support of the application for default judgment, the Court finds that the *Eitel* factors strongly favor default judgment against Defendants.

### 1. Possibility of Prejudice to the Plaintiff

The first *Eitel* factor asks the Court to consider the possibility of prejudice to the plaintiff. A defendant's failure to respond or otherwise appear in a case prejudices a plaintiff's ability to pursue its claims on the merits. Here, Plaintiff will suffer prejudice with no recourse to prevent further infringement or recover from the alleged contractual breaches. *See Levi Strauss & Co. v. Toyo Enter. Co.*, 665 F. Supp. 2d 1084, 1095 (N.D. Cal. 2009) (finding this factor satisfied where trademark plaintiff alleged inability "to prevent continued infringement and dilution"); *see also Aspen Am. Ins. Co. v. Morrow*, 643 F. Supp. 3d 941, 949 (D. Alaska 2022) (finding a possibility of prejudice to the plaintiff in a breach of contract claim because "[w]ithout entry of default judgment, Defendant could escape liability"). As a result, this factor weights in favor of default judgment.

### 2. Substantive Merits of Plaintiff's Claims and Sufficiency of the Complaint

The second and third factors focus on the merits of Plaintiff's substantive claims and the sufficiency of the complaint. *See Eitel*, 782 F.2d at 1471. These factors, often analyzed together, require courts to determine whether a plaintiff has "state[d] a claim on which [it] may recover." *PepsiCo, Inc.*, 238 F. Supp. 2d at 1175. Such analysis examines each claim's

plausibility. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Where the allegations in a complaint are not 'well-pleaded,' liability is not established by virtue of the defendant's default and default judgment should not be entered." *See Adobe Sys., Inc. v. Tilley*, No. C09-1085 PJH, 2010 WL 309249, at *3 (N.D. Cal. Jan. 19, 2010).

If a district court has "serious reservations" about the merits of a plaintiff's claims based on the pleadings, these factors weigh in favor of denying default judgment. *See Eitel*, 782 F.2d at 1472. Courts often consider these factors to be "the most important." *Vietnam Reform Party v. Viet Tan - Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019) (citation omitted). As detailed below, these two factors weigh in favor of default judgment as to all claims alleged in the FAC.

### i. Breaches of Contract Alleged Against the Viljoens

The Agreements both invoke California law as the law of the contract. (FAC, Ex. J § 14(b), Ex. K § 11.2.) In California, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011). Plaintiff demonstrates the facial plausibility of its breach of contract claims against Melany and Peet Viljoen, sufficiently alleging that the Viljoens breached both the Distribution Agreement and the License Agreement.

Plaintiff provides copies of the signed Agreements and alleges it performed all of the required material terms and conditions of the Agreements. (ECF No. 5 ¶¶ 49, 55.) Plaintiff's claims for breach of contract have facial plausibility because Plaintiff pleads factual content that the Viljoens continued to use Plaintiff's various marks and sold products and franchises after Plaintiff had terminated the Agreements. (*See, e.g.*, *id.* ¶ 35 (alleging the Viljoens started Tammy Taylor Global Franchising, which runs the Website

advertising franchises and nail and salon products under various TTN marks).) Such continued use of Plaintiff's marks after termination of the Agreements is a clear breach of each of the Agreements. (*Id.*, Ex. J § 11; *id.*, Ex. K § 8.3.) Further, Plaintiff demonstrates its harm from these breaches—customers submitted comments to Plaintiff complaining about the Viljoens' management and franchising practices in Africa. (ECF No. 20, Exs. 26–27.) In sum, these factors weigh in favor of entry of default judgment for Plaintiff as to the claims for breach of contract alleged against the Viljoens.

### ii.    Trademark Infringement and False Designation of Origin Alleged Against All Defendants

Plaintiff brings claims for trademark infringement under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a), and common-law trademark infringement. Claims of trademark infringement under 15 U.S.C. § 1114 and false designation of origin under 15 U.S.C. § 1125(a) "are subject to the same test." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008); *Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988). California common-law trademark claims are also evaluated by the same standards as federal trademark claims. *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1100 (9th Cir. 2004). Because they share the same analysis, the Court analyzes the substantive merits of these claims together.

To successfully assert a claim for trademark infringement, a plaintiff must plausibly allege (1) that it owns a valid, protectable mark; (2) that defendant used the mark without consent; and (3) that use of the mark is likely to cause confusion. 15 U.S.C. § 1114(1); *Century 21 Real Est. Corp.*, 846 F.2d 1175. "The critical determination is whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product." *Jada Toys, Inc.*, 518 F.3d at 632 (citing *Brother Recs., Inc. v. Jardine*, 318 F.3d 900, 908 (9th Cir. 2003)) (citation modified).

To the first element, a plaintiff's federal registration of a trademark is "prima facie evidence that the plaintiff owns a valid trademark." *Blumenthal Distrib., Inc. v. Comoch Inc.*, 652 F. Supp. 3d 1117, 1128 (C.D. Cal. 2023) (citation omitted). Here, TTN argues

the U.S. Registered Marks are valid and protectable, and, in support of this argument, TTN provides the Court with the federal registration numbers and certificates of the U.S. Registered Marks. (ECF No. 5, Exs. A–D.) As such, TTN adequately establishes that its U.S. Registered Marks are valid and protectable. *Blumenthal*, 652 F. Supp. 3d at 1128. Plaintiff similarly alleges that the Oval Double T Mark is valid and protectable by alleging and showing that it has priority of use—Plaintiff employed the Oval Double T Mark as early as 2011 and has continued to use it ever since. (ECF No. 5 ¶¶ 22, 25; ECF No. 20, Exs. 21–23); *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.), *as modified,* 97 F.3d 1460 (9th Cir. 1996) ("[T]he party claiming ownership [of the mark] must have been the first to actually use the mark in the sale of goods or services."). As to the second element, TTN claims Defendants do not have permission to use TTN's U.S. Registered Marks or Oval Double T Mark, yet Defendants have used these marks, and thus the second element is met.

Plaintiff also satisfies the third element. A likelihood of confusion is presumed when the offending mark is counterfeit or virtually identical to a protected mark and it is used on an identical product or service. *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 945 (9th Cir. 2011). Here, the U.S. Registered Marks and Oval Double T Mark are virtually identical with those used by Defendants and are used with identical products and services. The FAC thus successfully alleges the final element and successfully alleges trademark infringement under 15 U.S.C. § 1114, common-law trademark infringement, and false designation of origin under 15 U.S.C. § 1125(a), which weighs in favor of entering default judgment on these claims.

The Court notes, however, that this factor does not weigh in favor of default judgment as to any claim related to Tammy Taylor's South African Mark. The Lanham Act does not apply extraterritorially and only applies to commerce Congress may lawfully regulate. *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 419–21 (2023). The Court is unconvinced, therefore, that it has the power to adjudicate any dispute related to a

24cv0624

South African trademark used in South Africa, but Plaintiff is free to renew its Motion as to the South African Mark if it disagrees.

### iii.    Counterfeiting Alleged Against All Defendants

To prevail on its trademark counterfeiting claim, Plaintiff must prove that the Viljoens reproduced one or more of Plaintiff's registered marks and applied such reproduction to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the sale, distribution, or advertising of goods or services on or in connection with which such use is "likely to cause confusion . . . or to deceive." 15 U.S.C. § 1114(1)(b).

The FAC properly alleges the elements for this cause of action by laying out the identity of Plaintiff's U.S. Registered Marks (ECF No. 5, Exs. A–D), the likelihood of confusion between the U.S. Registered Marks and Defendants' products (*see supra*), and that the products and services sold by Defendants are not connected with Plaintiff (ECF No. 5 ¶ 40). The FAC further alleges that Plaintiff's reputation and goodwill has been damaged by the inferior quality of the counterfeit products and services. Accordingly, this factor weighs in favor of entering default judgment as to this claim.

### iv.    Cancellation of Registered Trademark Alleged Against the Viljoen Defendants

Courts have the power to cancel trademark registrations under the Lanham Act. 15 U.S.C. §§ 1064, 1119. Plaintiff cites fraud, priority, and likelihood of confusion as reasons for this Court to cancel the Viljoens' trademark registration of the Oval Double T Mark. (ECF No. 5 ¶ 83.)

"Cancellation of registration is proper when (1) there is a valid ground why the trademark should not continue to be registered and (2) the party petitioning for cancellation has standing." *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 348 (9th Cir. 1984). The second element is clearly met because Tammy Taylor Nails has established its use of the Oval Double T Mark continuously in commerce since 2011. (ECF No. 5 ¶ 22); *see Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1226 (9th Cir. 2008)

24cv0624

(acknowledging that "ownership of an unregistered trademark . . . is sufficient to establish standing under the Lanham Act").

Plaintiff principally rests its claim for cancellation of the Viljoens' trademark registration on grounds of fraud. "To succeed on a claim for cancellation based on fraud, [the moving party] must adduce evidence of (1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013) (citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990)). "A false representation in the original trademark application . . . may be grounds for cancellation if all five requirements are met." *Id.* (citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 20:58 (4th ed. 2005)). A party moving to cancel a registered trademark bears "a heavy burden." *Id.*

The FAC properly alleges the elements of this cause of action. The Viljoens, in their Federal Trademark Registration Application, represented that the Oval Double T Mark was first used in commerce on January 21, 2023. (ECF No. 5, Ex. L; ECF No. 20, Ex. 36 at 174.) This is false. Plaintiff first used this mark in commerce beginning in 2011 and has used it continuously since then. (ECF No. 5 ¶ 22.) The Viljoens were aware of this because they signed the Agreements with Plaintiff in 2017 and 2018, years before the Viljoens attempted to register the Oval Double T Mark in 2023. (*Id.* ¶¶ 10, 45.) The Viljoens sought to induce the United States Patent and Trademark Office's reliance on this misrepresentation in granting the Viljoens the trademark. It was reasonable for the United States Patent and Trademark Office to rely on the Viljoens' representations in their signed application. Plaintiff sufficiently alleges harm by stating it believes it has been damaged by this fraudulent registration of its own Oval Double T Mark. (*Id.* ¶ 103); *see Jun-En Enters. v. Lin*, No. CV 12-2734 PSG (SSX), 2014 WL 12580253, at *7 (C.D. Cal. Aug. 27, 2014); *see also La Canada Ventures, Inc. v. MDalgorithms, Inc.*, No. 22-CV-07197-

24cv0624

RS, 2024 WL 40205, at *5 (N.D. Cal. Jan. 3, 2024) (finding a counterclaimant adequately pled a claim for cancellation of a trademark registration on the basis of fraud where the counterclaimant alleged it was damaged by the registration).

Plaintiff thus sufficiently alleges each of its claims against each Defendant (apart from any claim related to the South African Mark) and therefore these factors weigh in favor of default judgment for the Plaintiff.

### 3.    The Sum of Money at Stake in the Action

According to the fourth *Eitel* factor, the court must consider "the sum of money at stake in the action." *Eitel*, 782 F.2d at 1471. Default judgment is warranted when Plaintiff's requested damages are "proportional to the harm caused by defendant's conduct." *Landstar Ranger, Inc. v. Parth Enters., Inc.*, 725 F. Supp. 2d 916, 921 (C.D. Cal. 2010). Where the sum of money at stake is substantial, default judgment is discouraged. *Blumenthal Distrib., Inc. v. Comoch Inc.*, 652 F. Supp. 3d 1117, 1130 (C.D. Cal. 2023).

Here, Plaintiff requests $22,176,000, plus attorney's fees and costs, in favor of Tammy Taylor Nails, Inc. and against Defendants, jointly and severally. (ECF No. 17 at 34.) This is a substantial sum. However, Plaintiff has pinned this sum to a damages expert's model, which assumes that Defendants' actions have precluded Plaintiff from embarking on a planned United States-focused franchising program. (ECF No. 17-28, Schulze Decl.), This factor is thus neutral toward default judgment. *See Silver Screen Films Inc. v. Hollywood Media Venture, LLC*, No. 2:22-CV-08901-SB-SSC, 2024 WL 1136526, at *3 (C.D. Cal. Feb. 9, 2024) (holding that because the conduct alleged was "egregious" and damages sought were tailored to the conduct, this factor was neutral despite the plaintiff requesting "millions").

### 4.    Possibility of Dispute Concerning Material Facts

The fifth *Eitel* factor asks the Court to consider whether there is a possibility of dispute concerning material facts. *Eitel*, 782 F.2d at 1471–72. Where, as here, a defendant has not filed an answer or otherwise responded to the operative complaint, it leaves the court without any facts in dispute. "In such cases, courts routinely find that no factual

24cv0624

dispute exists, and that therefore, this *Eitel* factor weighs in favor of granting default judgment." *Indian Hills Holdings, LLC v. Frye*, 572 F. Supp. 3d 872, 889 (S.D. Cal. 2021).

As noted, no Defendant has responded or otherwise appeared in this case. Accordingly, there is no dispute concerning material facts and this factor thus weighs in favor of granting default judgment.

### 5.    Possibility of Excusable Neglect

The sixth *Eitel* factor considers whether a defendant's default may have resulted from excusable neglect. *Eitel*, 782 F.2d at 1472. Where a defendant is "properly served with the Complaint, the notice of entry of default, as well as the papers in support of the instant motion," the default "cannot be attributed to excusable neglect." *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1005 (N.D. Cal. 2001). In this case, as discussed above, the Court finds each Defendant was properly served with each of Plaintiff's filings in the case. This sixth *Eitel* factor thus weighs in favor of default judgment.

### 6.    Policy Favoring Decision on the Merits

"Cases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. This factor weighs against default judgment.

However, the other *Eitel* factors outweigh this policy because of Defendants' failure to appear or otherwise answer Plaintiff's Complaint makes a decision on the merits impossible. Therefore, default judgment is appropriate.

## C.    Plaintiff's Requested Relief

### 1.    Damages

While the Court must accept Plaintiff's well pleaded facts in the FAC as true, Plaintiff must prove damages. *TeleVideo Sys. Inc.*, 826 F.2d at 917–18. The damages sought in default judgment may not exceed those requested in the pleadings. Fed. R. Civ. P. 54(c).

24cv0624

### i.    Lost profits

Plaintiff seeks lost profits damages as compensation for Defendants' trademark infringement as well as the breach of contract claims and calculates the damages to be $22,176,000. (ECF No. 17 at 16, 29–31, 34.) The requested amount does not exceed that requested in the FAC. (ECF No. 5 at 19 (seeking $100,000,000).) Plaintiff seeks this amount by claiming that Defendants ran the agreed-upon franchises in South Africa so terribly that the destruction of the Tammy Taylor reputation reached around the world to the United States and now TTN can no longer embark on its planned United States-based franchising program. (ECF No. 17 at 30–31.) Plaintiff therefore seeks from Defendants all the hypothetical profits of the first ten years of this hypothetical program, should it have launched in the United States. (*Id.*)

However, Plaintiff introduces no evidence of the core premise upon which it bases its damages request: any damage to the brand's reputation in the United States that would be so extensive as to preclude all domestic franchising possibilities for the next ten years. (ECF No. 17-28, Schulze Decl. ¶ 12.) While Plaintiff introduces ample evidence of the damage to TTN's name in South Africa (ECF No. 20, Ex. 26), it introduces no evidence of any damage to its name and Marks in the United States as a result of the Viljoens' breaches of the Agreements and infringement beyond TTN's founder saying the business's reputation in the United States has also been harmed (ECF No. 17-1, Taylor Decl. ¶ 24). This is unreasonable.

Plaintiff's request for damages in the form of lost profits is thus denied without prejudice.

### ii.    Statutory damages

"TTN requests the maximum statutory damages, amounting to $4,000,000 for Defendants' counterfeit infringement of TAMMY TAYLOR and TAMMY TAYLOR NAILS." (ECF No. 17 at 27.) Again, this is in line with Plaintiff's request in the FAC. (ECF No. 5 at 20.) Plaintiff also moves for an award of post-judgment interest. (ECF No. 17 at 11, 34.)

24cv0624

In the case of willful counterfeit infringement, the Court may award statutory damages of not more than $2,000,000 per counterfeit mark per type of good or service sold. 15 U.S.C. § 1117(c)(2); *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1194 (9th Cir. 2001) ("If statutory damages are elected, the court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." (citation modified)).

Defendants' counterfeit infringement was clearly willful as the Viljoen Defendants, by virtue of signing the Agreements, were aware of at least the two U.S. Registered Marks. Further, the infringement appears to be ongoing and involves a number of products and services. (ECF No. 20, Exs. 28–34.) As Plaintiff has satisfied each element, the Court grants Plaintiff's motion for statutory damages and awards Plaintiff $4,000,000 for Defendants' counterfeiting of Plaintiff's U.S. Registered Marks, "TAMMY TAYLOR" and "TAMMY TAYLOR NAILS." However, Plaintiff's request for post-judgment interest is denied as it is incongruous with the relief requested in the FAC. (*See* ECF No. 5 at 21 (requesting an award of "prejudgment interest").)

### 2. Cancellation of the Viljoen Defendants' Registered Mark

Plaintiff also requests that the Court issue an order cancelling the Viljoens' registration for the Oval Double T Mark. (*Id.* ¶¶ 82–104.) As discussed above, Plaintiff successfully alleges this claim and therefore this relief is granted.

### 3. Permanent Injunction

Plaintiff requests an injunction pursuant to this Court's power under 15 U.S.C. § 1116. (*Id.* at 20.) Specifically, Plaintiff requests the Court enjoin and restrain

> Defendants and their agents, servants, and employees from further acts of unfair competition or infringement, including, without limitation, directly or indirectly using the Marks, or any other mark similar to the Marks;

(*Id.*) Plaintiff asks that the injunction require "that Defendants deliver to TTN for destruction all signs, products, advertisements, literature, and any other promotional material, which feature the Marks or any other trademarks confusingly similar to the

24cv0624

Marks;" shut down the website; cease selling any products that infringe on Plaintiff's marks; and cease selling any franchises or license agreements to any third parties that concern or use the marks or purport to be associated with TTN. (*Id.* at 20–21.)

A plaintiff seeking permanent injunctive relief must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Here, the *eBay* factors support issuing a permanent injunction regarding Plaintiff's common-law trademark and U.S. Registered Marks. Plaintiff is entitled to "a rebuttable presumption of irreparable harm" because the Court has found a Lanham Act violation. 15 U.S.C. § 1116. By failing to appear, Defendants have not rebutted this presumption in any way. Given Defendants' conduct and the need to avoid public confusion, the Court finds that the remaining *eBay* factors likewise support the imposition of an injunction against further infringement. The Court therefore grants the request for a permanent injunction, limited to the common-law Oval Double T Mark and the U.S. Registered Marks and all related marks.

### 4. Attorney's Fees and Costs

The Court also finds that attorney's fees and costs are appropriate in this case based the willfulness of Defendants' infringement as evidenced by their signing of the License and Distribution Agreements (and therefore awareness of the marks). The Lanham Act permits recovery of attorney fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a); *see also Discovery Commc'ns, Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282, 1291–92 (C.D. Cal. 2001) (for the purposes of recovering attorney's fees, "[a] case is exceptional if the defendant has acted in bad faith or with willful and deliberate conduct" and "a case may be considered exceptional where the defendants disregard the proceedings and do not appear.")

24cv0624

Although Plaintiff is certainly entitled to attorney's fees and costs, the Court presumes the numbers before it are not final in this case while Plaintiff determines whether it will renew its request for lost profits damages. The Court therefore denies without prejudice the request for attorney's fees and costs at this juncture. Should Plaintiff request damages again, it may re-file its Motion for Attorney's Fees and Costs. If Plaintiff chooses not to renew its request for lost profits damages, it may simply renew its Motion for Attorney's Fees and Costs.

## V.    CONCLUSION

As explained above, Plaintiff's Motion to Seal is **GRANTED**. Plaintiff's Motion for Default Judgment as to each of its claims is **GRANTED IN PART** where the claims relate to Plaintiff's U.S. Registered Marks and common-law Oval Double T Mark, as well as Plaintiff's claims for breach of contract, but the Motion is **DENIED IN PART** without prejudice where the claims relate to Plaintiff's South African Mark. Plaintiff's request for $22,176,000 in lost profits is **DENIED**, but its request for $4,000,000 in statutory damages is **GRANTED**. Plaintiff's request for attorney's fees and costs is **DENIED** without prejudice. Plaintiff's request for a permanent injunction is **GRANTED** and the Court hereby **ORDERS AND ENJOINS** as follows:

(1) The Court hereby **CANCELS** Melany Viljoen's and Peet Viljoen's U.S. Trademark Registration No. 7,322,502, such that it shall no longer be registered with the United States Patent and Trademark Office and will be null and void.

(2) Further, the Court **ENTERS** the following **PERMANENT INJUNCTION**[3] against Defendants and each of their officers, agents, servants, employees, and attorneys, and all others in active concert or participation with them who receive actual notice of this Order:

---

[3] The language of this injunction derives from the proposed judgment Plaintiff lodged with the Court's efile account when it filed the initial Motion for Default Judgment. The Court does not adopt the proposed language in its entirety as the Court has no grounds to determine it has the jurisdiction to address Plaintiff's South African Mark.

24cv0624

a. Defendants shall not directly or indirectly use and shall immediately cease the use of the names "Tammy Taylor" or "Tammy Taylor Nails," or of TTN's Oval Double T Mark;

b. Defendants shall not operate or hold themselves or their nail care business out to the public or others as being sponsored by, approved by, affiliated with, authorized by, or connected with, TTN, nor shall Defendants make any written or oral statement holding themselves or their nail care business out as "Tammy Taylor," "Tammy Taylor Nails," or as being in any way connected with TTN;

c. Defendants shall not offer for sale, solicit sales, advertise, or sell any products or services in any medium under any mark, name, symbol, logo, or other indicia that incorporates or is confusingly similar to "Tammy Taylor" or "Tammy Taylor Nails";

d. Defendants shall not offer for sale, solicit sales, advertise, or sell any nail care products, services, or retail stores in any medium, under any mark, name, symbol, logo, or other indicia that is likely to cause confusion or to cause mistake or to deceive persons into the erroneous belief that Defendants' products or services originate from TTN, or that Defendants or their agents are authorized by TTN or are endorsed by TTN or are sponsored by TTN, or are connected in some way with TTN;

e. Defendants shall contact any domain name registrar, social media website, such as Instagram or Facebook, to abandon all domain names or Instagram handles or Facebook profiles containing the words "Tammy Taylor," "Tammy Taylor Nails," or any of TTN's marks, including, without limitation the domain name http://tammytaylornails.co.za. Defendants shall remove or delete any reference to TTN or use of "Tammy Taylor" or "Tammy Taylor Nails" from their social media, including from Instagram and Facebook. Defendants shall contact any internet service provider to purge any domain

- 32 -

24cv0624

name server information from any web site addresses which have been used to promote Defendants' previous connection with TTN and contact any search engines to delete references to their formerly TTN-connected nail care businesses; and

    f.  Defendants shall remove and destroy any and all existing signage in their possession containing the TTN name or marks, and all existing printed materials in their possession bearing the TTN name and marks, including but not limited to, business cards, stationery, envelopes, labels, signs, prints, packages, advertisements, forms, contracts, promotional items and any other materials in Defendants' possession, custody or control, that identify Defendants or their nail care business as operating under the names "Tammy Taylor," "Tammy Taylor Nails," and any and all proofs, plates, and any other means for making such material.

Should Plaintiff wish to renew its Motion for Default Judgment as to the South African Mark or its request for damages in the form of lost profits, such request must be filed **no later than July 16, 2025**.

Plaintiff's counsel is hereby directed to serve a copy of this Order on Defendants.

**IT IS SO ORDERED.**

DATED: June 25, 2025

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**

24cv0624